286 N.J. Super. 106 (1995)
668 A.2d 434
PETER B. CONTINI, ASSISTANT COMMISSIONER, DIVISION OF FIELD SERVICES, NEW JERSEY, DEPARTMENT OF EDUCATION, PETITIONER-RESPONDENT,
v.
BOARD OF EDUCATION OF NEWARK, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 16, 1995.
Decided December 22, 1995.
*110 Before Judges PETRELLA, SKILLMAN and P.G. LEVY.
Alan Dexter Bowman argued the cause for appellant (Brown & Brown and Mr. Bowman, attorneys; Mr. Bowman, Raymond M. Brown and Ernest G. Ianetti, of counsel and on the briefs).
Sally Ann Fields, Senior Deputy Attorney General, argued the cause for respondent (Deborah T. Poritz, Attorney General, attorney; Mary C. Jacobson, Assistant Attorney General, of counsel; Ms. Fields, Kevin Marc Schatz and Elizabeth M. Laufer, Deputy Attorneys General, on the brief).
Melissa Vance Kirsch, attorney for amicus curiae New Jersey Association of School Administrators, submitted a brief.
The opinion of the court was delivered by SKILLMAN, J.A.D.
The primary issue presented by this appeal is whether the Commissioner of Education (the Commissioner) is required under *111 the provisions of the Public School Education Act of 1975, L. 1975, c. 212, as amended in 1987, L. 1987, c. 398, N.J.S.A. 18A:7A-1 to -52, which authorize the removal of a local board of education and the creation of a state-operated school district, to conduct an evidentiary hearing even though there is no dispute regarding the facts relied upon to support this proposed administrative action.
This administrative proceeding was initiated by respondent Peter B. Contini, an Assistant Commissioner of the Department of Education, filing a petition which alleged that the appellant Board of Education of Newark (Newark Board) had failed or been unable to provide a thorough and efficient system of public education in Newark. The petition further alleged that the Department of Education had been monitoring the operation of the Newark schools for a period of ten years pursuant to the monitoring system established under N.J.S.A. 18A:7A-14. This monitoring, which is conducted in all public school districts, consists of periodic evaluations based on general "elements" and "indicators" of the thoroughness and efficiency of each district's educational system. N.J.A.C. 6:8-4.3 to 4.10; see Abbott v. Burke, 119 N.J. 287, 350-52, 575 A.2d 359 (1990). The Essex County Superintendent of Schools conducted an initial review of the Newark district, called level I, between March and August 1984, which resulted in unacceptable ratings on seven of ten elements and thirteen of fifty-one indicators. The Newark school district then moved into the level II monitoring process, which involved the development and implementation of an improvement plan to correct the deficiencies identified in level I. The Essex County Superintendent of Schools conducted level II monitoring between August 1986 and February 1987, which resulted in unacceptable ratings on seven of ten elements and sixteen of fifty-one indicators. A level III Verification Review was conducted during October and November 1992, which resulted in a report to the Commissioner that identified conditions that continued to prevent the Newark school district from achieving certification. Subsequently, the Commissioner determined that conditions existed within the Newark school district that precluded the successful implementation of a corrective *112 action plan. Consequently, the Commissioner initiated a Comprehensive Compliance Investigation which revealed numerous deficiencies and irregularities and resulted in the petition for removal of the Newark Board and creation of a State-operated district.
The Commissioner referred the petition to the Office of Administrative Law (OAL), which assigned the matter to an Administrative Law Judge (ALJ). After a period for discovery, respondent moved for a summary decision approving the removal of the local school board and the establishment of a state-operated district or, in the alternative, a declaration that the Department of Education had made out a prima facie case as to all or substantially all of the facts alleged in the petition. Extensive documentary material was submitted in support of and in opposition to this motion, and oral argument was conducted.
The ALJ issued a fifty-eight page decision, which concluded that "there are no material facts genuinely in dispute as to petitioner's determination ... that ... respondent failed to take or is unable to take the corrective action necessary to establish a thorough and efficient system of public education for its 48,000 students." The ALJ rejected the Newark Board's argument that a motion for a summary decision could not be granted even though the proposed administrative action was based on undisputed facts. The ALJ concluded that even though the Public School Education Act establishes a right to a "plenary hearing" before any "corrective action" may be ordered, including the creation of a State-operated school district, this right is subject to the provisions of the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -15, and its implementing regulation, N.J.A.C. 1:1-12.5, which authorize a summary decision when there is no material disputed issue of fact. The ALJ further concluded that the removal of the Newark Board was justified by the low level of school attendance in Newark, the high level of students who "drop out" after eighth grade, the inordinately high level of non-instructional employees, the "deplorable condition of some of the physical facilities," the *113 unavailability of textbooks, workbooks and other vital instructional materials in many schools and the "abysmal record of performance by Newark's students as measured on standardized tests."
The Commissioner adopted the findings and conclusions of the ALJ, observing that the Newark Board's exceptions to the ALJ's initial decision did not "specifically identify any material factual disputes." The Commissioner observed that the photographs and videotape submitted in support of the motion for summary decision "vividly depict schools with crumbling ceilings, warped floors, unlocked supply closets, overflowing sinks, inoperable toilets, exposed wires and filthy grounds." The Commissioner also observed that "pupil performance data indicates ... an utter failure by the Board to prepare its students to function as citizens and workers in society." The Commissioner further indicated that "[t]he historic failure of the district to achieve certification through the monitoring process, the exceedingly low test scores of the students ... and the Board's inability to meet its affirmative obligation to ensure safe and clean facilities in the district ... is made all the more troubling by the proofs submitted ... regarding the expenditures by Board members for meals, trips, cars and flowers." The Commissioner concluded that the undisputed facts demonstrate a "decade of failure" by Newark "to meet the State's minimum standards for certification as providing a thorough and efficient system of education," and recommended that the State Board of Education (State Board) remove the Newark Board and create a State-operated school district to administer the Newark schools.
After hearing oral argument, the State Board issued a forty-four page written decision accepting the Commissioner's recommendation, and on July 5, 1995, entered an administrative order removing the Newark Board and creating a State-operated school district for Newark. The State Board agreed with the ALJ and the Commissioner that a local school board's right to a hearing under the Public School Education Act is subject to the summary decision procedures established under the APA. It also concluded *114 that the summary decision procedure was appropriate in this case because "Newark has failed to present ... anything to suggest that a remand for further hearing would result in any conclusion other than that it has failed to provide a thorough and efficient education for over a decade." The State Board emphasized that the Newark Board recognized the many deficiencies in Newark's schools but had failed to assume any responsibility for correcting those deficiencies.
The Newark Board appealed from the State Board's decision and moved for a stay pending appeal. This motion was denied by the State Board, this court and ultimately the Supreme Court, thus allowing the State-operated district to assume control of the Newark school system on July 12, 1995.
On appeal, the Newark Board argues that even if there are no disputed material facts relating to the proposed removal of a local school board and creation of a State-operated district, the Public School Education Act requires the Commissioner to conduct an evidentiary hearing before ordering such administrative action. In the alternative, the Newark Board argues that there are genuine issues of fact material to the decision to create a State-operated school district in Newark. We reject both arguments and affirm the State Board's final decision.

I
The Newark Board argues that because the Public School Education Act requires a "plenary hearing" before the Commissioner or the State Board may order any corrective action, including the creation of a State-operated school district, an evidentiary hearing is required even if there are no disputed issues of fact material to this proposed administrative action.
The relevant sections of the Public School Education Act provide:
Based on the [comprehensive compliance investigation], the commissioner shall issue a report which will document any irregularities and list all those aspects of the corrective action plan ... which have not been successfully implemented by the *115 district or the conditions which would preclude the district from successfully implementing a plan.... The commissioner shall also order the local board to show cause why an administrative order, subject to the provisions of [N.J.S.A. 18A:7A-15 and N.J.S.A. 18A:7A-34] should not be implemented. The plenary hearing before a judge of the Office of Administrative Law, pursuant to the "Administrative Procedure Act," P.L. 1968, c. 410 (C. 52:14B-1 et seq.), upon said order to show cause shall be conducted in the manner prescribed by [N.J.S.A. 18A:6-9 to -29].
[N.J.S.A. 18A:7A-14(e) (emphasis added).]
If, after a plenary hearing, the commissioner determines that it is necessary to take corrective action, the commissioner shall have the power to order necessary budgetary changes within the district or other measures the commissioner deems appropriate to establish a thorough and efficient system of education.... If the commissioner determines that the district has failed to take or is unable to take the corrective actions necessary to establish a thorough and efficient system of education, the commissioner shall recommend to the State board that it issue an administrative order creating a State-operated school district.
[N.J.S.A. 18A:7A-15 (emphasis added).]
Although the Public School Education Act contains no definition of the term "plenary hearing," N.J.S.A. 18A:7A-14(e) expressly states that the hearing required thereunder shall be conducted "pursuant to the [APA]" and "in the manner prescribed by [N.J.S.A. 18A:6-9 to -29]." Therefore, to determine the kind of hearing required under the Public School Education Act, we must refer to the pertinent provisions of the APA and N.J.S.A. 18A:6-9 to -29.
The APA, originally enacted in 1968, L. 1968, c. 410, provides in relevant part that "[i]n a contested case, all parties shall be afforded an opportunity for hearing after reasonable notice," N.J.S.A. 52:14B-9(a), and that "[o]pportunity shall be afforded all parties to respond, appear and present evidence and argument on all issues involved." N.J.S.A. 52:14B-9(c). The APA was amended and supplemented in 1978 by the enactment of legislation creating the OAL. L. 1978, c. 67; see generally, In re Uniform Admin. Procedure Rules, 90 N.J. 85, 89-91, 447 A.2d 151 (1982). The 1978 amendments specifically authorized the Director to "[d]evelop uniform standards, rules of evidence, and procedures, including but not limited to standards for determining whether a summary or plenary hearing should be held to regulate the *116 conduct of contested cases and the rendering of administrative adjudications." N.J.S.A. 52:14F-5(e). The Director exercised this authority by adopting uniform administrative procedure rules, 12 N.J.R. 362(a) (1980), including a rule authorizing ALJs to make "summary decision[s]" in "contested case[s]" which do not involve disputed material issues of fact. N.J.A.C. 1:1-12.5.[1] Our Supreme Court has sustained the validity of this rule, noting that it is "related to and, indeed, essential to the proper conduct of administrative hearings in contested cases." In re Uniform Admin. Procedure Rules, supra, 90 N.J. at 106, 447 A.2d 151.
Although N.J.S.A. 18A:7A-14(e) only refers to the 1968 public law that enacted the APA, L. 1968, c. 410, and not to the 1978 amendments that created the OAL, the Legislature designated the 1978 law as an amendment to the original APA, L. 1978, c. 67, and clearly intended the two laws to operate as part of a unitary statutory scheme. Thus, the 1978 amendments authorize the creation of the OAL and the appointment of ALJs to hear contested cases under the APA. N.J.S.A. 52:14F-4; N.J.S.A. 52:14B-10(c). These amendments also require the Director of the OAL to adopt "rules for the prompt implementation and coordinated administration of [the APA]," N.J.S.A. 52:14F-5(f), and to "[a]dminister and supervise the procedures relating to the conduct of contested cases and the making of administrative adjudications, as defined [in the APA]." N.J.S.A. 52:14F-5(g). The Supreme Court has indicated that the essential legislative purpose in creating the OAL was to establish an efficient and fair system for the administration of the APA, most particularly, "to achieve higher levels of fairness in administrative adjudications." Unemployed-Employed Council of N.J. v. Horn, 85 N.J. 646, 650, 428 A.2d 1305 (1981). Therefore, we are satisfied that the Legislature intended *117 all the procedures under the APA, including those enacted in 1978 and codified in N.J.S.A. 52:14F-1 to -11, to apply to proceedings involving the proposed removal of a local school board and the creation of a State-operated school district. Cf. In re Commitment of Edward S., 118 N.J. 118, 133, 570 A.2d 917 (1990).
The Newark Board argues that the insertion of "plenary" before "hearing" in N.J.S.A. 18A:7A-14(e) and N.J.S.A. 18A:7A-15 reflects a legislative intent that the summary decision procedures which govern all other contested case hearings under the APA are inapplicable to proceedings involving corrective action under the Public School Education Act.[2] The term "plenary hearing" is commonly understood to mean "a complete and full proceeding conducted before a judge, providing the parties with discovery, the opportunity to present evidence, to give sworn testimony, to cross-examine witnesses and to make arguments." N.J.A.C. 1:1-2.1. Although the statutory provisions governing most state administrative agencies do not use the word "plenary" to describe the kind of hearing required in a quasi-judicial proceeding, such statutes often impose the same procedural requirements described by the term "plenary hearing." See, e.g., Casino Control Act, N.J.S.A. 5:12-107(a)(4) ("Each party to a hearing shall have the right to call and examine witnesses; to introduce exhibits relevant to the issues of the case[;] ... to cross-examine opposing witnesses in any matters relevant to the issue of the case; to impeach any witness, regardless of which party called him to testify; and to offer rebuttal evidence"); Ski Lift Safety Act, N.J.S.A. 34:4A-9(a) ("At such hearing the operator shall have the right to be *118 heard personally or by counsel, to cross-examine witnesses appearing against him and to produce evidence in his own behalf."). In fact, the APA itself provides that "[a]ny party in a contested case may present his case or defense by oral and documentary evidence, submit rebuttal evidence and conduct such cross-examination as may be required, in the discretion of the administrative law judge, for a full and true disclosure of the facts." N.J.S.A. 52:14B-10(a). Thus, the term "plenary hearing," as used in N.J.S.A. 18A:7A-14(e) and N.J.S.A. 18A:7A-15, is simply a shorthand description of the same kind of quasi-judicial "contested case" hearing that other state administrative agencies are required to conduct under their enabling legislation and the APA. Since such hearings are subject to the summary decision procedures of the APA and its implementing regulations, those procedures are equally applicable to proceedings involving the proposed creation of a State-operated school district.
The Newark Board's argument that an evidentiary hearing is mandated, even in the absence of any contested issue of material fact, due to the use of the term "plenary hearing" in N.J.S.A. 18A:7A-14(e) and N.J.S.A. 18A:7A-15, resembles an argument that we rejected in In re Township of Warren, 247 N.J. Super. 146, 159, 588 A.2d 1227 (App.Div. 1991), rev'd on other grounds, 132 N.J. 1, 622 A.2d 1257 (1993). There the plaintiff argued that the part of the Fair Housing Act which states that, "[i]f the mediation efforts are unsuccessful, the matter shall be transferred to the [OAL] as a contested case as defined in the [APA]," N.J.S.A. 52:27D-315(c), required the automatic referral of a petition for substantive certification to the OAL, even in the absence of a contested factual issue. In rejecting this argument, we stated:
Although N.J.S.A. 52:27D-315(c) describes the obligation to refer to the OAL in mandatory terms, it does so by express incorporation of the Administrative Procedure Act. In our view, this incorporation encompasses N.J.S.A. 52:14F-7, which authorizes the agency with ultimate decision making authority "to determine whether a case is contested."
[In re Township of Warren, supra, 247 N.J. Super. at 159, 588 A.2d 1227.]
Similarly, we conclude that the direction in N.J.S.A. 18A:7A-14(e) that a "plenary hearing" be conducted "pursuant to the [APA]" *119 encompasses the summary decision procedures authorized by N.J.S.A. 52:14F-5(e) and N.J.A.C. 1:1-12.5.
The conclusion that all the procedures governing "contested cases" under the APA, including the summary decision rule, are applicable to a proceeding involving the proposed creation of a State-operated school district is reinforced by the incorporation into N.J.S.A. 18A:7A-14(e) of N.J.S.A. 18A:6-9 to -29, which governs the hearing of controversies and disputes under the education laws. These sections include N.J.S.A. 18A:6-20, which states in pertinent part:
Any party to any dispute or controversy ... may be represented by counsel at any hearing held in or concerning the same and shall have the right to testify, and produce witnesses to testify on his behalf and to cross-examine witnesses produced against him, and to have compulsory process by subpoena to compel the attendance of witnesses to testify and to produce books and documents.
However, the right to an evidentiary hearing provided by N.J.S.A. 18A:6-20 is subject to the APA and the regulations adopted thereunder. N.J.S.A. 52:14F-5(f). In fact, the State Board's regulations governing "controversies and disputes" expressly state that proceedings in contested cases transmitted to the OAL shall be governed by the OAL's Uniform Administrative Procedural Rules, N.J.A.C. 6:24-1.10(b), which include the summary decision rule.[3]See also Board of Educ. of City of Plainfield v. Cooperman, 209 N.J. Super. 174, 212, 507 A.2d 253 (App.Div. 1986) (noting that "a plenary evidentiary hearing is not required by statute on every controversy and dispute"), aff'd as modified, 105 N.J. 587, 523 A.2d 655 (1987). Therefore, we conclude that, regardless of whether the procedural attributes of an evidentiary hearing are expressly set forth, as in N.J.S.A. 52:14B-10(a) and N.J.S.A. 18A:6-20, or the hearing is simply characterized as "plenary," as in N.J.S.A. 18A:7A-14(e) and N.J.S.A. 18A:7A-15, the statutory right to a hearing is subject to the summary decision procedures of the APA.
*120 This conclusion is supported by the general principle that "[a]n evidentiary hearing is mandated only when the proposed administrative action is based on disputed adjudicatory facts." In re Farmers' Mut. Fire Assurance Ass'n of N.J., 256 N.J. Super. 607, 618, 607 A.2d 1019 (App.Div. 1992); see also High Horizons Dev. Co. v. State of N.J., Dep't of Transp., 120 N.J. 40, 49-53, 575 A.2d 1360 (1990). Since the OAL's summary decision rule is simply a procedural mechanism for determining whether a proposed administrative action turns on disputed adjudicatory facts, a summary decision does not abridge a party's right to a hearing. As one commentary has explained:
Summary judgment honors the right to be heard by allowing the party opposing the motion to show the necessity for a trial and by placing the burden on the party seeking summary disposition.... Just as summary judgment is not in conflict with the right to trial by jury because it is available only when there is nothing for the jury to decide, a rule allowing summary decision in administrative adjudications would not improperly deny the right to a hearing since it would allow the hearing examiner or agency to dispense with an evidentiary hearing only if the absence of a hearing could not affect the decision.
[Ernest Gellhorn & William F. Robinson, Jr., Summary Judgment in Administrative Adjudication, 84 Harv.L.Rev. 612, 616-17 (1971).]
This principle has been held to apply even when the governing statute appears to mandate an evidentiary hearing. Thus, in Weinberger v. Hynson, Westcott & Dunning, 412 U.S. 609, 617-22, 93 S.Ct. 2469, 2477-79, 37 L.Ed.2d 207, 216-19 (1973), the Court held that the Food and Drug Administration could use summary procedures in denying a new drug application even though the governing legislation required an applicant to be afforded an "opportunity for a hearing." The Court stated that it could not "impute to Congress the design of requiring, nor does due process demand, a hearing when it appears conclusively from the applicant's `pleadings' that the application cannot succeed." Id. at 621, 93 S.Ct. at 2479, 37 L.Ed.2d at 218; see also 1 Kenneth Culp Davis & Richard J. Pierce, Jr., Administrative Law Treatise § 8.3 at 389 (3d ed. 1994) ("Even when an agency is required by statute or by the Constitution to provide an oral evidentiary hearing, it need do so only if there exists a dispute concerning a material fact.").
*121 The Newark Board also argues that an evidentiary hearing was a prerequisite to the creation of a State-operated district because its members and administrators had property interests in their positions that were protected by the due process clauses of the federal and state constitutions. However, even when constitutionally protected interests are at stake, due process does not require an evidentiary hearing unless there are contested material issues of fact. Codd v. Velger, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977); Weinberger v. Hynson, Westcott & Dunning, supra. "[I]t is the presence of disputed adjudicative facts, not the vital interests at stake, that requires the protection of formal trial procedure." High Horizons Dev. Co. v. State of N.J., Dep't of Transp., supra, 120 N.J. at 53, 575 A.2d 1360.
Therefore, we conclude that a local school board's right to an evidentiary hearing prior to its removal and the creation of a State-operated district is subject to the summary decision procedures established under the APA.

II
We turn next to the question whether respondent's motion for a summary decision should have been denied because there were genuine issues of fact material to the proposed creation of a State-operated school district in Newark.
A summary decision may be made if the pleadings, discovery and affidavits "show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to prevail as a matter of law." N.J.A.C. 1:1-12.5(b). Once the moving party presents sufficient evidence in support of the motion, the opposing party must proffer affidavits setting "forth specific facts showing that there is a genuine issue which can only be determined in an evidentiary proceeding." Ibid. This standard is substantially the same as that governing a motion under Rule 4:46-2 for summary judgment in civil litigation. Frank v. Ivy Club, 228 N.J. Super. 40, 62, 548 A.2d 1142 (App.Div. 1988), rev'd on unrelated grounds, 120 N.J. 73, 576 A.2d 241 (1990), cert. *122 denied, 498 U.S. 1073, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991). Under this standard, the court or agency must determine "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523, 666 A.2d 146 (1995). "If there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a `genuine' issue of material fact." Id. at 540, 666 A.2d 146.
The State Board's consideration of the Commissioner's recommendation that it create a State-operated school district in Newark[4] was governed by N.J.S.A. 18A:7A-15, which provides in pertinent part that "upon its determining that the school district is not providing a thorough and efficient system of education, the State board may direct the removal of the district board of education and the creation of a State-operated school district." Thus, the essential precondition to the State Board's creation of a State-operated school district is a finding that "the school district is not providing a thorough and efficient system of education." Consequently, if there is any dispute as to the facts underlying this finding, there must be an evidentiary hearing.
One critical indicator of whether a school district is providing a thorough and efficient system of education is the basic skills of its students as measured by standardized tests. Indeed, our Supreme Court has stated that satisfactory performance on such tests is "a prerequisite to ... a thorough and efficient education." Abbott v. Burke, supra, 119 N.J. at 369, 575 A.2d 359. The State Board's regulations now state that acceptable performance on the *123 Grade 11 High School Proficiency Test consists of 85% of the students scoring at or above the minimum level of proficiency. N.J.A.C. 6:8-4.6(a)(3)(i). The performance of Newark's students falls far short of this standard, with only 42.4% of its 11th graders passing all three sections of the test during the 1993-94 school year. Similarly, while the State Board's regulations define acceptable performance on the Eighth Grade Early Warning Test as 75% of eighth grade pupils scoring at or above the minimum level of proficiency, N.J.A.C. 6:8-4.6(a)(2)(i), only 30.7% of the students in the Newark district reached this level in 1994. Thus, when the respondent initiated proceedings to remove the Newark Board, the students in the Newark school district were failing by a substantial margin to meet even minimal standards of competence on standardized tests. The Newark Board did not dispute these seriously substandard test results, but simply noted that those results were not the lowest in the State. However, the mere fact that other districts also may be failing to provide the constitutionally mandated level of public education does not create a factual issue material to the State Board's conclusion that Newark's test results demonstrated that it was not providing a thorough and efficient system of education.
A second critical indicator of whether a school district is providing a thorough and efficient system of education is the adequacy of its facilities. Abbott v. Burke, supra, 119 N.J. at 362-63, 575 A.2d 359. In support of his motion for summary decision, respondent submitted photographs and a videotape that showed deteriorated, unclean and unsafe conditions in many schools. Moreover, as the Commissioner observed, "some of the identified deficiencies appear[ed] to be the result of long-standing neglect rather than a temporary condition." Respondent also presented evidence that many elementary schools in the district had serious shortages of instructional materials, such as math, reading and spelling workbooks and textbooks, science textbooks and library books. The Newark Board did not question the authenticity of the photograph and videotape showing deteriorated, unclean and *124 unsafe conditions in its schools, or the accuracy of the reports of shortages of instructional materials. In fact, the evidence of inadequate instructional materials was a "needs audit" conducted by the Newark Board itself, which was compiled from reports submitted by the principals of its schools. Therefore, the essential facts upon which the State Board relied in concluding that the Newark Board was not providing a thorough and efficient system of education were uncontested.[5]
The Newark Board argues that the State Board based its decision solely on inadmissible hearsay. However, a contested case hearing under the APA is not subject to the rules of evidence except for rules of privilege. N.J.S.A. 52:14B-10(a); N.J.R.E. 101(a)(3); Hills Dev. Co. v. Township of Bernards, 103 N.J. 1, 60, 510 A.2d 621 (1986). In any event, the State Board's conclusion that the Newark Board was failing to provide a thorough and efficient system of education was based entirely on evidence that either falls within an exception to the rule against hearsay or is not hearsay. The State Board's findings regarding test results were based on State records that would be admissible under N.J.R.E. 803(c)(8) as "statistical findings of a public official." According to the certification of Dr. Gerald E. DeMauro, who was responsible for the Department of Education's testing programs, *125 the tests were administered through the local districts pursuant to well-settled procedures, and the results were compiled under Dr. DeMauro's supervision. Such test results satisfy the conditions of admissibility under N.J.R.E. 803(c)(8), because it was "within the scope of [Dr. DeMauro's] duty to make such statistical findings" and the method of preparation assured that they were "trustworthy." The State Board's findings regarding the inadequacy of instructional materials in the Newark schools were based solely on the Newark Board's own "needs audit." Since this audit consisted of statements by "representatives" of the Newark school district, N.J.R.E. 803(b)(1), who were acting within the scope of their official responsibilities, the results of the needs audit would be admissible under N.J.R.E. 803(b)(4) as statements by a party-opponent. The photographs and videotape of certain Newark schools were not hearsay evidence, because they were not "statements," which are defined as "(1) an oral or written assertion or (2) nonverbal conduct of a person ... intended ... as an assertion." N.J.R.E. 801(a). Thus, the only prerequisite to the admission of this evidence was authentication, which was properly provided by a certification.
The Newark Board also argues that the motion for summary decision should have been denied because the Department of Education failed to provide full discovery. However, the Newark Board was not diligent in seeking discovery. More importantly, the Newark Board has failed to identify any document or group of documents that the Department of Education failed to produce that might have created a dispute of fact as to any of the findings which underlie the State Board's conclusion that the board was failing to provide a thorough and efficient system of public education.
After making the threshold finding required under N.J.S.A. 18A:7A-15  that "the school district is not providing a thorough and efficient system of education"  the State Board next had to determine whether the most appropriate form of "corrective action" was the creation of a State-operated school district. *126 By providing that the State Board "may" direct the removal of a local school board and the creation of a State-operated school district, N.J.S.A. 18A:7A-15 confers broad discretionary authority upon the State Board to determine whether such remedial action will provide the best opportunity to correct the deficiencies in a local school system. The determination whether to order the creation of a State-operated district rather than other remedial action that would not involve the removal of the local board depends upon various considerations, including the State Board's evaluation of the capabilities and attitudes of the local board's members and administrators and the progress a local board has made and appears likely to make in correcting the deficiencies in its system. Such a discretionary determination is not purely factual in nature but also involves substantial questions of "policy or discretion." See High Horizons Dev. Co. v. State of N.J., Dep't of Transp., supra, 120 N.J. at 50, 575 A.2d 1360 (quoting 2 K. Davis, Administrative Law Treatise § 12.2, at 409-10 (2d ed. 1979)). Consequently, an evidentiary hearing is required only to the extent that the determination whether to order a particular form of remedial action turns on disputed adjudicative facts.
In concluding that the Newark Board's past failure to provide a thorough and efficient system of public education required its removal and the creation of a State-operated district, the State Board noted the rampant nepotism within the Newark school district, the Newark Board's excessive expenditures for travel, restaurant meals and social activities, and most significantly, the Newark Board's unwillingness to assume responsibility for the deficiencies in the district's facilities and educational programs:
The record is replete with glaring examples of Newark's failure to grasp its obligations and to comprehend what is required of it in order to fulfill them. One of the most telling examples is the District's response to the undisputed fact that each member of the Newark Board, as well as many of its high ranking administrators, has at least one relative on the District's payroll, and that ten of the current Executive Superintendent's relatives are employed by the District.
....

*127 Even assuming that no Newark official actually used his or her position to secure employment for relatives and that all the relatives who were hired were qualified, Newark is oblivious to a situation which should be causing it a great deal of concern.
The appearance created by such employment alone should be disturbing to Newark.
....
The District's verification of the "Data Discrepancy Review" based upon the level III External Review Monitoring Report is replete with acknowledgements that the level III findings are accurate, in response to which the District offers only excuses for its failures to meet the criteria. What is most striking is the fact that, from the District's perspective, there was not a single failure that was caused by anything that was within the District's control. For example, the fact that the District was not in compliance with requirements to have current documentation of annual fire inspections was the Fire Department's fault, and the failure of its schools to have health certificates was the Health Department's fault.
....
In the same "Discrepancy Analysis" the District stated that it was in agreement with the findings of the level III monitoring that 4 of 80 of its buildings had not been approved as school buildings based on New Jersey Department of Education standards, that 53 of 76 schools did not meet minimal criteria, and that 92% of the schools (70 of 76) had ceilings, walls or floors with holes, sags, damage, or other hazards.
From this record, it is apparent that Newark does not yet understand that there is something wrong with its approach. It is not the fact that Board members may have attended a conference in Hawaii, or eaten in a nice restaurant, or sent flowers at Board expense which in and of itself is disturbing. Rather, what is alarming is the fact that the District spends its money in this manner while budgeting lesser amounts for such items as school libraries.[6]
....
The District's denial of responsibility extends to the delivery of the District's educational programs. The District's Discrepancy Analysis views monitoring as something to which the District has been "subjected." Its answers to petitioner's interrogatories show that, in Newark's view, the District has fulfilled its responsibility to ensure that principals ensure that students have sufficient textbooks, supplies, equipment and course offerings merely by the act of directing the principals to complete annual orders, to submit emergency orders, to review mandated course offerings and to instruct administrative personnel to schedule students for appropriate courses.... Similarly, Newark feels that it has assigned *128 and supervised staff in a manner that "facilitates effective instruction" when it has directed the principals to observe staff, review lesson plans and evaluate staff.
....
Given the record here and the right of the students of Newark to a constitutionally adequate education, the tired excuses and promises to do better in the future which the Newark Board is now offering us are not sufficient.
Insofar as the State Board's decision to remove the Newark Board and create a State-operated district rested on the factual findings reflected in the quoted part of the State Board's decision, those findings were undisputed. Evidence concerning the number of relatives of board members and the Superintendent of Schools employed by the district and the Board's expenditures on travel, meals and social activities were derived from the board's own records. Similarly, the State Board's conclusions regarding the Newark Board's lack of appreciation of its responsibilities under the Public School Education Act was derived from the Newark Board's responses to the interrogatories in this administrative proceeding and to the deficiencies in the Newark school system identified by the Department of Education in its ten years of monitoring.
These undisputed facts provided a sufficient foundation for the State Board's discretionary determination that the most appropriate "corrective action" for the establishment of a thorough and efficient system of public education in Newark was the removal of the Newark Board and the creation of a State-operated school district. The State Board's decision recognized that the State has the constitutional and statutory responsibility to assure that all children between the age of five and eighteen years are provided a thorough and efficient system of free public schools. N.J. Const., Art. 8, § 4, para. 1; N.J.S.A. 18A:7A-2, -4. "[D]elegation of any part of the educational function to school districts does not dilute that State responsibility." Abbott v. Burke, 136 N.J. 444, 455, 643 A.2d 575 (1994). Consequently, if a local school board fails to discharge its responsibilities, the Commissioner and State Board must take whatever action may be necessary to provide the constitutionally guaranteed educational opportunity, see In re Bd. *129 of Educ. of City of Trenton, 86 N.J. 327, 431 A.2d 808 (1981); In re Bd. of Educ. of Upper Freehold Regional School Dist., 86 N.J. 265, 430 A.2d 905 (1981), including when appropriate the removal of the local board and creation of a State-operated district. N.J.S.A. 18:7A-15. The undisputed facts presented by respondent showed that the Newark Board had failed over a substantial period of years to provide a thorough and efficient system of public education in Newark and had not taken any effective action to correct the manifest deficiencies in the district's educational programs. Therefore, there was a reasonable basis for the State Board's conclusion that a State-operated school district should be created to administer the Newark school system.
Affirmed.
NOTES
[1] The provisions governing summary decisions were set forth originally at N.J.A.C. 1:1-13.1 to 13.4. However, a thorough revision of the rules governing the OAL was adopted in 1987, see 19 N.J.R. 715(a) (1987), including the modified form of the summary decision procedure set forth in its present, single rule format. N.J.A.C. 1:1-12.5.
[2] The requirement of a "plenary hearing" was part of the original version of N.J.S.A. 18A:7A-15 enacted in 1975. L. 1975, c. 212, § 15. Although this term was not used in the original version of N.J.S.A. 18A:7A-14(e), the 1987 amendments to the Public School Education Act included a revision of N.J.S.A. 18A:7A-14(e) that inserted "plenary" before "hearing." L. 1987, c. 398, § 2. Since this amendment simply conformed N.J.S.A. 18A:7A-14(e) to the preexisting "plenary hearing" requirement of N.J.S.A. 18A:7A-15 and at the same time added the reference to the APA, it does not reflect a legislative intent to expand the procedural requirements of proceedings under the Public School Education Act.
[3] We also note that those regulations authorize the Commissioner to grant a "summary judgment" without referring the matter to the OAL if "there are no issues of fact to be heard." N.J.A.C. 6:24-1.13.
[4] Although the Commissioner is authorized to order other forms of corrective action required to provide a thorough and efficient system of education in a local school district, only the State Board has the authority under N.J.S.A. 18:7A-15 to remove a local school board and to create a State-operated district.
[5] In a supplemental brief, the Newark Board argues that the ALJ erred in excluding evidence of "reform programs" that it initiated after respondent's petition was filed. However, the Newark Board never challenged this ruling before the Commissioner or the State Board, and thus abandoned the objection. See Muto v. Kemper Reinsurance Co., 189 N.J. Super. 417, 420-21, 460 A.2d 199 (App.Div. 1983). In any event, the Newark Board has never made any proffer of evidence to show any significant improvement in its educational program after the filing of the petition.

In that same brief, the Newark Board argues that the State Board's decision was procedurally deficient because the Commissioner "failed to certify the record" to the State Board in conformity with N.J.A.C. 6:2-2.6(b). However, the Newark Board never raised this objection before the State Board. Therefore, the issue is not properly before this court. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973). In any event, it appears that the Commissioner did in fact certify the record on May 26, 1995.
[6] The Board's expenditures for travel, meals and social activities for its ten members totalled $77,412.18 for the period from July 1, 1989 through August 31, 1990, which was more than double the amount that the district expended for high school libraries during this same period.