**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0821-16T1

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

    Petitioner-Respondent,

v.

DGRT STABLES, LLC, d/b/a
DGRT SERVICES, MICHAEL
D'ANGELO and DERRICK
GREENBERG,

    Respondents-Appellants.

_____

Submitted January 10, 2018 — Decided July 16, 2018

Before Judges Fuentes and Suter.

On appeal from the New Jersey Department of
Environmental Protection.

Starkey, Kelly, Kenneally, Cunningham &
Turnbach, attorneys for appellants (Alton D.
Kenny, of counsel and on the brief; Clifford
P. Yannone, on the brief).

Christopher S. Porrino, Attorney General,
attorney for respondent (Jason W. Rockwell,
Assistant Attorney General, of counsel;
Elspeth Faiman Hans, Deputy Attorney General,
on the brief).

PER CURIAM

Defendants DGRT Stables, LLC, Michael D'Angelo and Derrick Greenberg appeal from the September 30, 2016 Final Decision by the Commissioner of the New Jersey Department of Environmental Protection (DEP). The Final Decision found defendants violated the Solid Waste Management Act (SWMA), N.J.S.A 13:1E-1 to -227, for failing to obtain a license to transfer and dispose of solid waste in violation of N.J.A.C. 7:26-16.3(a), and violated the Solid Waste Utility Control Act (SWUCA), N.J.S.A. 48:13A-1 to -13 for failing to obtain a certificate of public convenience and necessity, in violation of N.J.A.C. 7:26H-1.6(a). Defendants were fined a total of $100,000, consisting of $50,000 for violation of N.J.A.C. 7:26-16.3(a) and $50,000 as an economic penalty imposed pursuant to N.J.A.C. 7:26-5.9. Because the Final Decision was entered following DEP's motion for summary disposition, our review is de novo. L.A. v. Bd. of Educ. of City of Trenton, 221 N.J. 192, 204 (2015). We affirm the Commissioner's decision. There was ample support in the record that defendants violated the Acts and for the penalties imposed by the Commissioner, which penalties were not arbitrary, capricious or unreasonable.

I.

Defendant DGRT was a New Jersey limited liability company (LLC) that initially was in the business of hauling hay and straw for racetrack stables and later began to haul dirt. It is no

longer in business. Defendant Derrick Greenberg was its president, owner, and a managing member. Defendant Michael D'Angelo was "a salesman, promoter and day to day operator of [DGRT]." He was its consultant, but not a payroll employee or member of the limited liability company. Greenberg and D'Angelo communicated daily.

In April 2013, D'Angelo signed a handwritten contract, on behalf of DGRT, with VisionStream LLC (VisionStream) to supply 2000 loads of clean fill between May 1 and June 30, 2013, to a location in Old Bridge where VisionStream was constructing a mixed-use commercial and residential development. The fill was intended to raise the grade of the property. Under the contract, D'Angelo agreed that the "[m]aterial brought to the site will need to pass the material compatibilities and Old Bridge Township requirements and NJ residential . . . and USEPA requirements."

In May 2013, D'Angelo signed a contract with Michael Mecca (Mecca) where D'Angelo agreed, for $250 per load, that DGRT would remove recycled concrete aggregate fill that was commingled with asphalt millings from a site in Jersey City where an old warehouse had been demolished sometime between 1997 and 2002. The Mecca contract confirmed that D'Angelo was given a July 24, 2012 soil analysis from Restoration & Conservation, LLC,[1] "outlining" that

---

[1] The only July 24, 2012 soil analysis in the record is from Analytical Chemists.

the materials "meet[] New Jersey commercial criteria and another report showing minor exceedances in the NJ residential criteria." By signing the contract, D'Angelo expressly "acknowledge[d] and accept[ed] all New Jersey environmental rules, regulations and specifications associated with the disposal location" where he was taking these materials.

A representative of VisionStream wrote to D'Angelo advising DGRT that the data provided by Mecca "meet[s] the requirements for our site" but requested that D'Angelo "resend" the analytical reports for their "official records. . . . to make sure that we keep the correct reports, as we had so many reports while we were negotiating and don't want to confuse the reports."

When DEP commenced its investigation, VisionStream provided DEP with a copy of soil analyses by Analytical Chemists. That report, dated July 24, 2012, analyzed samples of the material from the Mecca site. One of those samples showed the presence of benzo(a)pyrene in the amount of .279 mg/kg, which exceeded the direct contact soil remediation standard of 0.2 mg/kg. Benzo(a)pyrene is a known carcinogen.[2]

---

[2] The ingestion/dermal contact level for benzo(a)pyrene is actually lower (0.06mg/kg), but 0.2 mg/kg is used because DEP advised that this is the "lowest level that can practicably be detected and quantified by testing laboratories."

Greenberg and D'Angelo claimed that they did not review the soil analysis report provided by Mecca "but relied on the representations presented in the Mecca [l]etter and VisionStream [l]etter."

DGRT contracted with subcontractors to excavate and load the material at the Mecca site and with trucking firms to haul the materials to the VisionStream site in Old Bridge. Between May and July 2013, 895 loads were delivered to the VisionStream site. Mecca paid DGRT $223,650 to remove the materials from the Mecca site. VisionStream paid DGRT $40,220 to deliver the materials to Old Bridge. DGRT paid its subcontractors $20 per load to excavate and load the materials and $200 per load to transport them.

Following its investigation, DEP issued a Notice of Civil Administrative Penalty Assessment (NOCAPA) to DGRT and D'Angelo in February 2015, for the unlicensed transportation of solid waste in violation of the SWMA. The NOCAPA was amended on October 16, 2015, to include Greenberg and an economic penalty. The amended NOCAPA alleged that defendants engaged in the brokering of solid waste without an A-901 license, as required by N.J.A.C. 7:26-16.3(a), and then by accepting and selling solid waste obtained from the Mecca site to be used as fill at the VisionStream site, which was being developed for commercial and residential use. DEP alleged that defendants failed to hold certificates of public

convenience and necessity as required by N.J.A.C. 7:26H-1.6(a). The amended NOCAPA imposed a $100,000 civil administrative penalty which consisted of a $50,000 penalty against all the parties for violation of N.J.A.C. 7:26-16.3(a) and an economic benefit penalty of $50,000, also against all parties, in accordance with N.J.A.C. 7:26-5.9.

Defendants requested an administrative hearing. The case was transferred to the Office of Administrative Law (OAL) as a contested case. DEP filed a motion for summary decision in March 2016. See N.J.A.C. 1:1-12.5(a). It contended there were no disputed issues of fact requiring a hearing. An Administrative Law Judge (ALJ) decided the motion in DEP's favor, issuing her Initial Decision on May 20, 2016. Defendants filed exceptions. The Commissioner of DEP issued a Final Decision on September 30, 2016, that adopted the Initial Decision, finding that DEP was "entitled to summary decision as a matter of law against DGRT, and against Greenberg and D'Angelo, individually."

In his Final Decision, the Commissioner found that the materials transported from the Mecca site and deposited at the VisionStream site constituted solid waste under N.J.A.C. 7:26-1.6, whether or not unsafe levels of benzo(a)pyrene were present in those materials. Defendants did not submit any evidence to refute the soil tests that showed the presence of benzo(a)pyrene at a

level exceeding DEP standards. The letters from Mecca and VisionStream that defendants relied on in their defense made reference to testing that showed an excess level of benzo(a)pyrene. As such, defendants had not shown there were any disputed factual issues about the transportation of solid waste without a license.

The Final Decision held Greenberg individually liable as a "responsible corporate officer" because he was "aware of key aspects of DGRT's business with Mecca and VisionStream" and, as president and sole owner of DGRT, "would have been in a position to prevent the violations of the SWMA and rules." The Final Decision also imposed individual liability upon D'Angelo, as a "person" under N.J.A.C. 7:26-1.4 who was required to have a license to engage in the solid waste industry, N.J.A.C. 7:26-16.3(a), because he was "the consultant and manager responsible for DGRT's daily operations." He was a "key decision maker" about DGRT's operations along with Greenberg and "played an integral role in the transport of the Mecca site material without a solid waste license."

The Final Decision imposed penalties, finding that violation of N.J.A.C. 7:26-16.3 was major and the degree of conduct of the defendants was also major. See N.J.A.C. 7:26-5.5(g)(1). The Commissioner applied DEP's civil administrative penalty matrix and then adjusted the penalty to the maximum amount, agreeing with the

ALJ that defendant's actions "created a risk to the public by contaminating a future residential site with a carcinogen." The Commissioner also imposed a $50,000 economic penalty, finding that DEP reasonably calculated defendants' economic benefit to be at $66,970 "based on the costs and profits per load transported multiplied by the number of loads as supported by certifications and documentation." Although defendants objected to DEP's calculations, they did not "supply any certifications or affidavits to support their claims." Therefore, the Commissioner did not find any disputed issues of fact related to the economic penalty.

On appeal, defendants contend that there were disputed issues of fact that warranted a hearing at the OAL. They argue they did not violate the SWMA because they relied on the letters from Mecca and VisionStream that the soil was acceptable. They did not intend to transport "solid waste" under the Act. For the first time on appeal, defendants contend that they should not have been held individually liable for any violation. Even if there were a violation of the SWMA, defendants assert any violation was minor, warranting a lesser civil penalty, and that the economic penalty did not reflect their economic benefit.

We review de novo an agency's summary decision because it is a legal determination. L.A., 221 N.J. at 204. The standard governing agency determinations under N.J.A.C. 1:1-12.5 is "substantially the same as that governing a motion under Rule 4:46-2 for summary judgment in civil litigation." Id. at 203 (quoting Contini v. Bd. of Educ. of Newark, 286 N.J. Super. 106, 121-22 (App. Div. 1995)). Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburg, 224 N.J. 189, 199 (2016) (quoting R. 4:46-2(c)). We are not "bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue." L.A., 221 N.J. at 204 (alteration in original) (quoting Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 302 (2011)).

We agree with the Commissioner that there were no genuine issues of fact here that precluded summary decision. The case did not present "competent evidentiary materials" that would permit a "rational factfinder" to resolve the issues in defendants' favor

or require a plenary haring.  See <u>Brill v. Guardian Life Ins. Co. of Am.</u>, 142 N.J. 520, 540 (1995).

The SWMA regulates the collection, transportation, storage and disposal of solid waste in New Jersey.  N.J.S.A. 13:1E-2.  The purpose was to "[e]stablish a statutory framework within which all solid waste collection, disposal and utilization activity in this State may be coordinated."  N.J.S.A. 13:1E-2(b)(1).  The Legislature found:

> That the collection, transportation, treatment, storage, and disposal of solid waste are critical components of the economic structure of this State and, when properly controlled and regulated, make substantial contributions to the general welfare, health and prosperity of the State and its inhabitants by minimizing the serious health and environmental threats inherent in the management of these wastes;
>
> That the regulatory provisions of this act are designed to extend strict State regulation to those persons involved in the operations of these licensed activities so as to foster and justify the public confidence and trust in the credibility and integrity of the conduct of these activities.
>
> [N.J.S.A. 13:1E-126.]

Under the SWMA regulations, "No person shall engage or continue to engage in the collection, transportation, treatment, storage, transfer or disposal of solid waste or hazardous waste in this State without a license or without complying with all the

provisions of N.J.S.A. 13:1E-126 et seq[.]" N.J.A.C. 7:26-16.3. Further N.J.A.C. 7:26H-1.6(a) provides, "No person shall engage in the business of solid waste collection or solid waste disposal as defined in N.J.S.A. 48:13A-3 unless such person is the holder of a certificate of public convenience and necessity issued by the Department."

Here, defendants do not dispute that at the time they contracted for the removal and transportation of materials from the Mecca site to the VisionStream site that none of the defendants held any license or a certificate of public convenience or necessity.

There was no factual issue on this record that what was transported was solid waste within the meaning of the SWMA. The Act defines solid waste generally as "garbage, refuse, and other discarded materials resulting from industrial, commercial and agricultural operations, and from domestic and community activities." N.J.S.A. 13:1E-3. N.J.A.C. 7:26-1.6(a) defines solid waste as "any garbage, refuse, sludge . . . or any other waste material . . . ."[3] N.J.A.C. 7:26-1.6(b) defines "other waste material" as:

---

[3] The regulation was amended in 2017 to expressly include within the definition of solid waste, "processed or unprocessed mixed construction and demolition debris, including, but not limited to,

11                                                              A-0821-16T1

any solid . . . including, but not limited to spent material . . . resulting from industrial, commercial . . . operations. . . or any other material which has served or can no longer serve its original intended use, which:

(1) [i]s discarded or intended to be discarded; or

. . . .

(4) [i]s applied to the land . . . or

(5) [i]s recycled.

A material also is solid waste under N.J.A.C. 7:26-1.6(c) if "it is 'disposed of' by being discharged, deposited, injected, dumped, spilled, leaked or placed into or on any land or water so that such material or any constituent thereof may enter the environment or be emitted into the air or discharged into ground or surface waters."

Defendants contend that the letters they received from Mecca and VisionStream created an issue of fact about whether the materials constituted solid waste. However, there was no dispute that the materials transported resulted from the demolition and removal of a warehouse. By any of the definitions cited, these

wallboard, plastic, wood or metal, are solid wastes. 48 N.J.R. 1526(a)(1). Prior to this, the term "clean fill" excluded "processed or unprocessed mixed construction and demolition debris, including, but not limited to, wallboard, plastic, wood or metal." Ibid.

materials constitute solid waste as discarded materials from industrial or commercial operations that are deposited on or into the land.

Defendants urge that what they transported "was only recognizable as stone, dirt and concrete." They argue a fact issue exists about whether this was clean fill as previously defined in the regulations, meaning,

> an uncontaminated nonwater-soluble, nondecomposable, inert solid such as rock, soil, gravel, concrete, glass and/or clay or ceramic products. Clean fill shall not mean processed or unprocessed mixed construction and demolition debris, including, but not limited to, wallboard, plastic, wood or metal. The non-water soluble, non decomposable inert products generated from an approved Class B recycling facility are considered clean fill
>
> [48 N.J.R. 1526(a)(1).]

They base their argument on the Mecca and VisionStream letters that said the soil sample met commercial standards and met the requirement for the site.

However, these letters never created a genuine issue that the materials transported did not have benzo(a)pyrene present at a level exceeding standards. Both letters cited to the soil analysis. The Mecca letter cited to a July 24, 2014 test that showed the soil exceeded New Jersey residential criteria. VisionStream actually supplied DEP with copies of the Analytical

13

Chemists report that showed benzo(a)pyrene present at an excess level. Defendants did not provide any testing that refuted these findings. We are to consider all "competent evidential material" on summary decision. Brill, 142 N.J. at 540. There must be a genuine issue of material fact to defeat the motion, not an inference lacking any proof.

Defendants argue that they did not intend to commit a violation, but the SWMA does not require that DEP prove a violation was knowingly or intentionally committed. See State v. Lewis, 215 N.J. Super. 564, 572 (App. Div. 1987) (providing that the SWMA did not "require a finding of intent to violate the Act before [its] remedies may be invoked").

The record supported the Commissioner's summary decision. Defendants arranged for the removal and transportation of solid waste without the requisite license which violated the SWMA. The materials transported contained benzo(a)pyrene at levels exceeding DEP's standards. Defendants submitted no evidence that contested the analysis of the soil sample. By failing to do so, they did not prove there was any genuine issue of material fact that would have required a hearing.

We reject Greenberg's and D'Angelo's argument that they should not be held individually responsible for violating the SWMA. Greenberg was the owner and managing member of DGRT. He had

14

daily contact with D'Angelo. He was in a position to control the company and prevent it from transporting the materials or obtain a license to do so. We have long held that an officer who "had actual responsibility for the condition resulting in the violation or [was] in a position to prevent the occurrence of the violation but failed to do so" can be held responsible for the condition that caused the violation. Dep't of Envtl. Prot. v. Standard Tank Cleaning Corp., 284 N.J. Super. 381, 403 (App. Div. 1995).

D'Angelo was individually responsible under the SWMA regulations as a "person" engaged in the collection, transportation, transfer or disposal of solid waste. N.J.A.C. 7:26-16.3. Although not an officer or managing member of DGRT, he was a key decision maker. He signed the contracts and received the analyses of the soil. He was in daily contact with Greenberg.

Defendants contend that the Commissioner erred in assessing the administrative and economic penalties. The Commissioner assessed an administrative penalty of $50,000 for violating N.J.A.C. 7:26-16.3(a) and imposed a $50,000 economic penalty under N.J.A.C. 7:26-5.9.

We will not reverse the Commissioner's order assessing penalties unless we find the decision to be "'arbitrary, capricious, or unreasonable, or . . . not supported by substantial credible evidence in the record as a whole.'" Kadonsky v. Lee,

452 N.J. Super. 198, 202 (App. Div. 2017) (quoting In re Stallworth, 208 N.J. 182, 194 (2011)). We "defer to the specialized or technical expertise of the agency charged with administration of a regulatory system." K.K. v. Div. of Med. Assistance & Health Servs., 453 N.J. Super. 157, 160 (App. Div. 2018) (quoting In re Virtua-West Jersey Hosp., 194 N.J. 413, 422 (2008)).

The Commissioner imposed the $50,000 civil penalty based on his finding that defendants committed a major violation of the SWMA and that the degree of their conduct was major. Using the DEP's penalty matrix, he determined that the mid-range of the penalty was $45,000. See N.J.A.C. 7:26-5.5. He enhanced the mid-range to the maximum penalty of $50,000. There was nothing arbitrary, capricious or unreasonable about this. The commissioner applied the matrix. We agree with the Commissioner that the violation "created the potential for serious harm to prospective residents of and visitors to the VisionStream site and to the environment." This undermined the purpose of the SWMA licensing scheme. Defendants' degree of conduct also was major as defined by the regulations[4] because the Mecca letter advised

---

[4] "Major conduct shall include any intentional, deliberate, purposeful, knowing or willful act or omission by the violator." N.J.A.C. 7:26-5.5(h)(1).

them that the soil testing exceeded residential standards and they proceeded with the contracts anyway.

The Commissioner also imposed a civil administrative penalty for economic benefit. See N.J.A.C. 7:26-5.9 ("The Department may, in addition to any other civil administrative penalty assessed pursuant to this subchapter, include as a civil administrative penalty the economic benefit (in dollars) which the violator has realized as a result of not complying with, or by delaying compliance with, the requirements of the Act . . . ."). The Commissioner calculated that defendants' profits from this transportation was $66,970. This was calculated after taking into consideration the number of loads of materials, what DGRT charged Mecca and VisionStream, the amount still owed to them by VisionStream, and what DGRT had to pay its sub-contractors. Defendants take issue with the amounts they say they received from Mecca and VisionStream. However, they never submitted a certification or documentary evidence to support their claim. In contrast, the Commissioner relied on contracts, cancelled checks, and other documents supplied by defendants in discovery in making his calculation. There was nothing arbitrary, capricious or unreasonable about the Commissioner's analysis that assessed the economic penalty, which was fully supported by the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

17

A-0821-16T1