715 A.2d 308

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES,
RESPONDENT, v. M.R., APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued April 27, 1998—Decided July 21, 1998.

Skillman, J.A.D. and Eichen, J.A.D., concurred and filed opinions.

Before Judges PETRELLA, SKILLMAN and EICHEN.

*Gregory G. Diebold*, argued the cause for appellant (*Hudson County Legal Services Corp.*, attorney; *Kathleen E. Kitson*, of counsel and on the brief).

*Andrea M. Silkowitz*, Assistant Attorney General, argued the cause for respondent (*Peter Verniero*, Attorney General, attorney; *Ms. Silkowitz*, of counsel and on the brief; *Ressie Fuller*, Deputy Attorney General, also on the brief).

The opinion of the court was delivered by

PETRELLA, P.J.A.D.

On this appeal from a determination of the Division of Youth and Family Services (DYFS) that an allegation of child abuse made against M.R. (appellant) was substantiated, appellant argues she was improperly denied access to documents and a trial-type hearing in violation of her due process rights and fundamental fairness.

The dispute arose when DYFS received a referral on January 26, 1996, regarding the possible physical abuse of H.G., age 12,[1] by his mother, the appellant. Students in H.G.'s school approached a police officer at the school who was speaking at an anti-drug program, and informed him that H.G. had been kicked by his mother. On January 29, 1996, a caseworker from the North Hudson DYFS District Office conducted an investigation, which included an interview of appellant. She lived in one bedroom of a two-bedroom apartment with her three children, H.G., age twelve; Ruben, age eight; and Dimas, who at that time was seventeen days old. Her cousin Ernesto's family lived in the other bedroom. The caseworker decided that the allegations were substantiated by the statements obtained during her investigation from various individuals, and a bruise found on H.G.'s leg where his mother had

---

[1] His date of birth was January 1, 1983.

allegedly kicked him. The caseworker noted that appellant had not yet reported her youngest child to welfare and that she was depressed about her living situation. The caseworker reported that appellant admitted having hit H.G. with a wire hanger, scratching, slapping and kicking him, and leaving bruises. According to the caseworker's notes, appellant knew that this type of disciplinary behavior was wrong, but feared that if she did not keep H.G. from being loud, her cousin Ernesto would either hit H.G. or kick them out of the living arrangement. Apparently at the caseworker's suggestion, appellant applied for Section 8 housing to escape her current housing situation, and was put on a waiting list.

The caseworker's report of substantiated abuse under *N.J.A.C.* 10:129A–3.3 left the case "open to provide such services as needed." No services were provided, however, and no protective service case was filed under *N.J.S.A.* 9:6–8, assertedly because appellant had admitted her acts, knew that they were wrong, and agreed to change her disciplinary methods and participate in in-home counseling once she was able to move to more adequate living quarters.[2]

By a May 8, 1996 letter, DYFS informed appellant that (1) the caseworker had concluded that H.G. "was abused"; (2) she was "identified as harming the child or placing the child at risk of harm"; and (3) she could appeal that decision by way of a "Regional Dispositional Conference" within ten days. Although the letter did not detail the caseworker's findings, it stated that these findings would be retained in DYFS's files and not disclosed, except as permitted by *N.J.S.A.* 9:6–8.10a. She was also advised that failure to seek a Regional Dispositional Conference would result in the decision becoming a "final agency decision appealable only to the Appellate Division of the Superior Court."

---

[2] H.G. lives with his father in the Washington, D.C. area, and anticipates remaining there and graduating from high school. No counselling was ever provided to appellant.

Appellant requested a Regional Dispositional Conference review of the decision. On May 20, 1996, the Administrative Review Officer (ARO), Mary McArdle, acknowledged that request and informed appellant by letter that the determination would be on the basis of a record and document review, with an opportunity for her to provide relevant input or information for possible consideration in determining the correctness of the finding of substantiated abuse. McArdle also informed appellant that the record of the investigation would not be released to her because disclosure of investigatory records is limited by statute.

After the Legislature added subsection (12) to *N.J.S.A.* 9:6–8.10a(b) by a June 6, 1996 amendment, appellant's attorney, on June 18, again asked DYFS for the opportunity to review her case record. DYFS failed to respond to this letter. Appellant's attorney repeated the request in a November 18, 1996 letter.

McArdle informed appellant's attorney on November 25, 1996, that DYFS would only disclose the information which the reviewing officer considered "necessary for a determination of the issues on appeal." This view was iterated in McArdle's March 3, 1997 letter to appellant enclosing information which McArdle considered disclosable, in the form of a summary of the caseworker's findings.[3]

On March 14, 1997, appellant's attorney informed DYFS that appellant would dispute the facts in the summary prepared by DYFS. Appellant also asserts that in a March 26, 1997 telephone

---

[3] On March 4, 1997, appellant's attorney requested a summary of information which DYFS had determined that appellant would be allowed to review and repeated the previous request for more information. Presumably, this request crossed in the mail with McArdle's March 3 transmission. Appellant asserts that McArdle informed her attorney that the limited records available were only available to appellant, and thus neither the summary nor the final decision were sent to appellant's attorney directly. We discern no reason why an attorney representing a client before an agency should be denied documents available to the client. It appears that the amendment to *N.J.S.A.* 9:6–8.10a(17) by *L.* 1997, *c.* 175, § 16, effective July 31, 1997, now allows for disclosure to the attorney.

conversation McArdle again denied appellant and her attorney access to the DYFS records.

A Regional Dispositional Conference record and document review was held on April 10, 1997, attended by McArdle, appellant and her attorney, and an interpreter for appellant. Appellant gave a statement denying that the incident had occurred, describing current difficulties she was having with her son, admitting to having "grabbed at his ear" resulting in a scratch, and describing how she worked on a daily basis to remedy her son's problems. She also asserted that no one at DYFS had helped her after it had determined that the abuse was substantiated. No stenographic or sound recording record was made of this meeting.

Following the meeting, appellant's attorney submitted a written summation of factual and legal arguments, including a challenge to the procedures and the failure to disclose documents. Thereafter, McArdle concluded in a written opinion dated May 1, 1997, that the substantiation of abuse previously made was warranted. The Northern Regional Administrator approved that decision on May 5, 1997. The decision was never reviewed at any higher level within the agency. As a consequence of the finding of substantiated abuse appellant was listed in DYFS's Central Registry in accordance with *N.J.S.A.* 9:6–8.11 and *N.J.A.C.* 10:129A–3.4 as having abused a child. This appeal followed.

## I.

Appellant asserts that her liberty interests are implicated by the procedures employed by DYFS as they pose a threat to (1) her "good name, reputation, honor or integrity," and her right to "avoid the defamatory label 'abuser'"; (2) her right to "contract, to engage in any of the common occupations of life"; (3) her right to be free from "the foreclosure from future employment opportunities"; and (4) her right to "establish a home and bring up children." Appellant argues that the DYFS procedure for substantiating child abuse, with its resultant consequences, denied her

due process rights, employed fundamentally unfair procedures and violated the Administrative Procedure Act (APA).[4]

Statutory authority for DYFS to investigate and monitor child abuse allegations appear in *N.J.S.A.* 9:6–8.8 to –8.20 and *N.J.S.A.* 9:6–8.21 to –8.82, enacted by *L.* 1971, *c.* 437, effective February 10, 1972, and *L.* 1974, *c.* 119, effective Oct. 10, 1974. Under *N.J.S.A.* 9:6–8.10, a person who has reason to believe that a child has been subjected to child abuse is required to report that suspicion to DYFS. The regulations adopted to implement the statute, *see N.J.S.A.* 9:6–8.15 and 9:6–8.72, require DYFS to evaluate the available information to determine whether that allegation is "substantiated," "not substantiated" or "unfounded." *See N.J.A.C.* 10:129A–3.3. In its investigation, DYFS may request records from "public or private institutions, or agencies including law enforcement agencies, or any private practitioners." *N.J.S.A.* 9:6–8.40. Upon a determination that the allegation is "substantiated," the name of the person found to have committed child abuse and any identifying information are entered into a Central Registry maintained by DYFS.[5] *N.J.S.A.* 9:6–8.11; *N.J.A.C.* 10:129A–3.4.

The DYFS "Support Operations" Manual (Manual) was not promulgated under the APA but recites its intent to establish a dispute resolution policy consistent with the APA (*N.J.S.A.* 52:14B–1 to 24; 52:14F–1 to 13), and the Adoption Assistance and Child Welfare Act, 42 *U.S.C.A.* 670 to 687. The Manual states that upon an investigator/caseworker's determination that an alle-

---

[4] *N.J.S.A.* 52:14B–1 to –24.

[5] The statute originally referred to the "Central Registry of the Bureau of Children's Services." That Bureau's functions have been assumed by DYFS. *See N.J.S.A.* 30:4C–2. Whether the allegations are substantiated, not substantiated, or deemed unfounded, the Administrative Code requires notification that the investigation has been completed and the findings be given to: the perpetrator, the parent or caretaker with physical custody at the time of the incident, the parent residing with the child; if the child is institutionalized, then the institution and the parent to whom the child is returned; and the child him or herself if the DYFS representative deems the child able to understand and cope with the information. *N.J.A.C.* 10:129A–3.4(c) –(g).

gation of abuse has been substantiated, the perpetrator is notified that (1) he or she has been so identified; (2) identifying information has been entered in the Central Registry; and, (3) he or she has the right to request a Regional Dispositional Conference to dispute those findings, at either a hearing or record and document review, at the discretion of the ARO. The Manual outlines the procedures to determine whether a Regional Dispositional Conference should be held and, if so, the type of conference review, that is whether by a hearing or a record and document review, or some combination of both.

The Manual explains that the "appellant" [6] may bring witnesses or submit written statements or reports on his or her behalf and may be represented by a person, who need not be an attorney, to assist in preparation of the case. For a "hearing" (which is not a trial-type proceeding, but more akin to a meeting), or in some cases where there is to be a record and document review, as occurred here, the ARO schedules a meeting with the appellant.

Under the Manual, as in effect when the dispute arose and was decided, the written decision is to be made within sixty working days of the Regional Dispositional Conference and must indicate (1) whether it is final (appealable to the Appellate Division) or is instead subject to further DYFS or OAL review; [7] (2) findings of fact; (3) a conclusion; and (4) recommendations for corrective action.

Substantiated reports are forwarded to the Central Registry, along with any other reports received by DYFS under *N.J.S.A.* 9:6–8.10. These reports are confidential, *N.J.S.A.* 9:6–8.40, but

---

[6] A person requesting a Regional Dispositional Conference is called an "appellant" pursuant to Section 106 of the Manual.

[7] We are unaware of any change to the Manual in this regard as of this date. Despite the Manual's reference to potential referral to the Office of Administrative Law, DYFS adopted new regulations effective February 2, 1998, stating in part that a "[r]equest to change a finding in a child abuse investigation" is among the requests not to be transmitted to the OAL. *See N.J.A.C.* 10:120A–4.2(c)3.

may be disclosed as authorized in *N.J.S.A.* 9:6–8.10a, subject to certain restrictions. Violation of the confidentiality of this information is said to be a "misdemeanor." *N.J.S.A.* 9:6–8.10b. Release of the Central Registry information is allowed to entities investigating other allegations of child abuse, *e.g.,* police, a physician who suspects abuse, the courts or a grand jury, as well as certain researchers. *N.J.S.A.* 9:6–8.10a(b)(1) to –8.10a(b)(9). That Registry is also utilized in conjunction with *N.J.S.A.* 30:5B–16 to –31, the "Family Day Care Provider Registration Act." [8] The Central Registry may be checked by sponsoring organizations for the names of persons in the household of a state-sponsored family day care provider or the providers themselves before they are allowed to register. *N.J.S.A.* 9:6–8.10a(b)(10); *N.J.S.A.* 30:5B–25.3.[9] Such information may also become available when DYFS or the courts evaluate a person as a potential child-care giver. *N.J.S.A.* 9:6–8.10a(b)(16). Additionally, effective on June 6, 1996, two new subsections were added by amendment (*L.* 1996, *c.* 32, § 1) [10] which allows disclosure of that information to:

---

[8] That Act was significantly amended in 1993. *L.* 1993, *c.* 350, § 1 – § 5. The Legislative history of *c.* 350 indicates that in 1991, when registration by day care providers was changed to require criminal history record background checks for day care workers, the number of providers who registered dropped due to that expense. *Id.* at § 1, ¶ c. As a more cost-effective way to check on the background of day-care providers, the statute was amended to require DYFS to check its Central Registry to determine if a report of child abuse or neglect had been entered. *N.J.S.A.* 30:5B–25.3(a). A day care provider will not be issued a registration or renewal if a substantiated charge of child abuse or neglect is found in the Central Registry, or if the provider does not provide written consent to the search. *N.J.S.A.* 30:5B–25.3(b) and (d).

[9] Shortly after this appeal was filed on June 23, 1997, but prior to the briefs being filed in this appeal, the statute was amended by *L.* 1997, *c.* 175, § 16, effective July 31, 1997, to allow additional disclosure to specified persons or entities, including "a person who has filed a report of suspected child abuse or neglect for the purpose of providing that person with only the disposition of the investigation; . . ." *N.J.S.A.* 9:6–8.10a(18).

[10] As of May 8, 1996, the time that the appellant was notified that DYFS considered the abuse charge substantiated, these two sections of the statute were not in effect.

(13) Any person or entity mandated by statute to consider child abuse or neglect information when conducting a background check or employment-related screening of an individual employed by or seeking employment with an agency or organization providing services to children;

(14) Any person or entity conducting a disciplinary, administrative or judicial proceeding to determine terms of employment or continued employment of an officer, employee, or volunteer with an agency or organization providing services for children. The information may be disclosed in whole or in part to the appellant or other appropriate person only upon a determination by the person or entity conducting the proceeding that the disclosure is necessary to make a determination.

[N.J.S.A. 9:6–8.10a(b)(13) to –8.10a(b)(14).] [11]

Disclosure of the investigation to these entities is allowed regardless of whether the allegations are substantiated and whether

---

[11] *N.J.S.A.* 9:6–8.10a was further amended effective July 31, 1997 (*L.* 1997, *c.* 175, § 16) to require a written request for information, and to allow for disclosure to the following additional entities:

(15) The members of a county multi-disciplinary team, established in accordance with State guidelines, for the purpose of coordinating the activities of agencies handling alleged cases of child abuse and neglect;

(16) A person being evaluated by the division or the court as a potential care-giver to determine whether that person is willing and able to provide the care and support required by the child;

(17) The legal counsel of a child, parent or guardian, whether court-appointed or retained, when information is needed to discuss the case with the division in order to make decisions relating to or concerning the child;

(18) A person who has filed a report of suspected child abuse or neglect for the purpose of providing that person with only the disposition of the investigation;

(19) A parent or legal guardian when the information is needed in a division matter in which that parent or guardian is directly involved. The information may be released only to the extent necessary for the requesting parent or guardian to discuss services or the basis for the division's involvement or to develop, discuss, or implement a case plan for the child;

(20) A federal, State, or local government entity, to the extent necessary for such entity to carry out its responsibilities under law to protect children from abuse and neglect;

(21) Citizen review panels designated by the State in compliance with the federal "Child Abuse Prevention and Treatment Act Amendments of 1996," Pub.L. 104–325;

(22) The Child Fatality and Near Fatality Review Board established pursuant to P.L.1997, c. 175 (C.9:6–8.83 et al.).

or not the information has been entered into the Central Registry. *N.J.S.A.* 9:6–10a(a).

If appellant applied to be a foster parent, DYFS would check its own records for evidence of whether she had abused a child. *N.J.A.C.* 10:122C–2.6. And if she applied for adoption, at the request of an approved agency, the records of DYFS would be searched for "dispositions of child abuse or neglect matters," and that information would be provided to the approved agency for consideration. *N.J.S.A.* 9:3–54.2.

As mentioned above, the Central Registry is checked when a child care provider registers with a sponsoring agency. *N.J.S.A.* 9:6–8 .10a(6)(10); *N.J.S.A.* 30:5B–25.3.[12] Although registration with such a sponsoring organization is voluntary, the benefits of registration include qualification for the purchase of insurance, eligibility for enrollment in the Child Care Food Program, the ability to list homes with statewide child care resource and referral agencies, and qualification to provide care for children through state funded programs. *N.J.S.A.* 30:5B–25.1. Appellant asserts this impacts her adversely. She contends that being listed in the registry is a deterrent to her right to be hired as a day care provider.

Whether the requirements of procedural due process apply to the interest asserted hinges upon whether it is encompassed in the Fourteenth Amendment's protections of life, liberty and property. *Ingraham v. Wright,* 430 *U.S.* 651, 672, 97 *S.Ct.* 1401, 1413, 51 *L.Ed.*2d 711 (1977). If one of these interests is implicated, the second step of the analysis is to determine what procedure would afford the proper level of procedural due process to an individual being deprived of that right. *Ibid.*

■ The interest in reputation and the interest in nondisclosure have both been recognized as protectable liberty interests. *Whalen v. Roe,* 429 *U.S.* 589, 598–600, 97 *S.Ct.* 869, 876–877, 51 *L.Ed.*2d

---

[12] *L.* 1993, *c.* 350, § 5, effective June 29, 1995.

64, 73–74 (1977); *Wisconsin v. Constantineau,* 400 *U.S.* 433, 437, 91 *S.Ct.* 507, 510, 27 *L.Ed.*2d 515, 517 (1971); *Doe v. Poritz,* 142 *N.J.* 1, 100, 662 *A.*2d 367 (1995). However, reputation "apart from some more tangible interests such as employment, is not either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis,* 424 *U.S.* 693, 701–702, 96 *S.Ct.* 1155, 1160–1161, 47 *L.Ed.*2d 405, 413–414 (1976). Thus, it has been said there must be "stigma plus" some other tangible element in order to be considered a "protectable liberty interest." *Valmonte v. Bane,* 18 *F.*3d 992, 999 (2d Cir. 1994).

■ Here, appellant asserts that inclusion of her name on the Central Registry, and disclosure of that entry under *N.J.S.A.* 9:6–8.10a(b)(13) and –8.10a(b)(14), implicates her reputation and non-disclosure interests even though the Central Registry is not a record made available to the general public. *See N.J.S.A.* 9:6–8.11. If either of these actions had no consequence beyond an impact on reputation, it might not be deemed an impairment of a liberty interest. However, appellant claims that the adverse impacts, in addition to the public opprobrium and damage to her reputation from inclusion on the Central Registry, implicate her liberty interests, namely her family interest and her interest in employment, and satisfy the additional requirement.

■ Appellant asserts that the "stigma-plus" test is met by the implication on her family interests. Here, as to appellant's asserted right to establish a home and bring up children, the procedure used placed her name on a registry which is checked when she wants to either adopt, be a foster parent, or apply to be a home care provider. While freedom of personal choice in certain family life decisions is a fundamental liberty interest protected by the Fourteenth Amendment, *Santosky v. Kramer,* 455 *U.S.* 745, 753, 102 *S.Ct.* 1388, 1394, 71 *L.Ed.*2d 599, 606 (1982), it does not protect every aspect of family life. *Smith v. Organization of Foster Families,* 431 *U.S.* 816, 843, 97 *S.Ct.* 2094, 2109, 53 *L.Ed.*2d 14, 34 (1977). While the burdens here are formidable, standing alone

they would not rise to the level of a deprivation of her family liberty interest.

Appellant also asserts that the test is met because she is potentially foreclosed from working in a child-care related profession, because a potential employer would have access to her records, and this implicates her right to employment.[13] While the right to employment generally is protectable in certain contexts, *Matter of Carberry*, 114 *N.J.* 574, 583–584, 556 *A.*2d 314 (1989); *Nicoletta v. No. Jersey District Water Supply Commission*, 77 *N.J.* 145, 160, 390 *A.*2d 90 (1978), foreclosure from a mere expectancy is not enough to implicate a property interest. *Campbell v. Atlantic Cty. Bd. Freeholders*, 145 *N.J.Super.* 316, 326, 367 *A.*2d 912 (Law Div.1976), *aff'd* 158 *N.J.Super.* 14, 385 *A.*2d 311 (App. Div.1978). However, restriction of employment opportunities available to an individual implicates a recognized liberty interest. *Id.* at 327, 367 *A.*2d 912. Whether preclusion from one type of job in a particular field implicates a liberty interest is a closer question.

Appellant has standing to challenge DYFS's action in listing her in the Central Registry. *Allegations of Physical Abuse at Blackacre Academy*, 304 *N.J.Super.* 168, 176, 698 *A.*2d 1275 (App.Div.1997). *Cf. Marques v. Medical Examiners*, 264 *N.J.Super.* 416, 418, 624 *A.*2d 1034 (App.Div.1993). There is no doubt that appellant's listing may be accessed by various individuals and entities in the child care and related field, and could affect her ability to adopt or become a foster parent if she sought to do so. Here, appellant has had no meaningful opportunity to challenge the finding of child abuse which has been placed in the Central Registry. Moreover, no adequate record has been created by the agency for meaningful review on an appeal to this court.

---

[13] Whether a potential employer would have the right to ask a potential employee questions to elicit such information, and expect true and honest answers thereto is not implicated in this appeal.

Indeed, in *Allegations of Physical Abuse at Blackacre Academy, supra* (304 *N.J.Super.* at 176, 698 *A.*2d 1275), DYFS acknowledged, and we concluded, that its finding that a child abuse allegation was "substantiated" is a basis for judicial review because that finding is placed in DYFS's Central Registry. *Id.* at 177, 698 *A.*2d 1275. We there noted:

> Significantly, appellants do not argue that the [investigative unit] should have conducted an evidentiary hearing or seek a remand for a hearing. Rather, appellants' argument is that because the [investigative unit's] investigation was deficient, the results of that investigation should be suppressed, or alternatively, that this court should undertake a *de novo* review of the statements and other documents produced in that investigation.
>
> [*Id.* at 181, 698 *A.*2d 1275.]

Although on the record then before us we found no procedural defects, *id.* at 187–188, 698 *A.*2d 1275, we added that if the investigative unit's actions were shown to be procedurally deficient, we would remand the matter for an evidentiary hearing or whatever other proceedings were required to correct that defect. We observed in passing:

> It is now firmly established that the "due process" requirements which govern the proceedings of an agency that makes binding legal determinations directly affecting legal rights do not apply to agency proceedings which are purely investigatory in nature. *See Hannah v. Larche*, 363 *U.S.* 420, 80 *S.Ct.* 1502, 4 *L.Ed.*2d 1307 (1960) ... As the Court noted in *Hannah v. Larche:*
>
> > "Due process" is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. Thus, when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process. On the other hand, when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used.
>
> > [363 *U.S.* at 442, 80 *S.Ct.* at 1514–1515, 4 *L.Ed.*2d at 1321.]
>
> However, if a government agency publicly disseminates findings which adversely affect the subject of an investigation, the agency may be required as a matter of due process to establish procedures by which the investigatory findings may be challenged.
>
> [*Id.* at 182, 698 *A.*2d 1275 (additional citations omitted).]

In *Blackacre* we held that mere transmittal to the State Department of Education of a report describing the results of an investigation of alleged child abuse by the faculty of the child-care day

school did not implicate any liberty or property interest which would then entitle appellants to due process protections required in adjudicatory proceedings. *Id.* at 183, 698 *A.*2d 1275. Nor did we find that the dissemination of the fact of placement of an individual in the Central Registry, and the disclosure of that information in accordance with the statute to other parties whom the Legislature determined had a need to know, violated due process. *Id.* at 185, 698 *A.*2d 1275.

*Blackacre* is distinguishable because that case did not focus on the individual; rather it focused on the school and the potential involvement of the State Board of Education:

> In fact, appellants' briefs indicate that their primary concern relates not to the inclusion of their names in the Central Registry, but rather the transmittal of the [investigative agency's] investigatory report to the Department of Education.
>
> [*Id.* at 187, 698 *A.*2d 1275.]

We did not conclude that this was significant because any action by the Department of Education to affect the status of the school would require an evidentiary hearing. *Blackacre* also relied on the fact that as of that time New Jersey had not enacted more pervasive provisions such as the New York statutory scheme, which requires employers in the child care field to determine whether a job applicant is listed in the Central Registry. *Id.* at 187, 698 *A.*2d 1275.

Another distinguishing factor is that *Blackacre* did not consider the adequacy of the Regional Dispositional Conference procedures because they were not adopted until after the agency's action. In observing that "a hearing might be required under other circumstances to resolve the conflicts between" the testimony of the alleged abused child and the personnel at Blackacre, *id.* at 189, 698 *A.*2d 1275, *Blackacre* did conclude that the former procedures did not deny appellants due process under the circumstances. *Id.* at 188 n. 7, 698 *A.*2d 1275.

*Blackacre* distinguished *Valmonte v. Bane, supra* (18 *F.*3d at 1992), a case which considered New York procedures for substantiation of abuse, relying largely on a difference in the standard of

proof in New York.[14] Valmonte became entangled in the system when she slapped her eleven year old daughter on the side of her face as punishment for stealing. Her position was that other forms of discipline had not been successful. New York's statutory scheme required that individuals be listed in New York's Central Register if the local Department of Social Services (DSS) found some credible evidence of abuse and that the acts related to child care. The record of those individuals would be maintained and available to child care provider agencies and employers. *Id.* at 996. The procedures utilized by DSS were held inadequate:

> the dissemination of information from the Central Register to potential child care employers, coupled with the defamatory nature of inclusion on the list, does implicate a liberty interest. We also hold that the procedures established violate due process, primarily because the risk of error in evaluating the allegations against those included on the list is too great.
>
> [*Id.* at 994.]

*Valmonte* discussed at length the implications of damage to one's reputation and the requirement of "stigma plus" to establish a constitutional deprivation, *id.* at 999, and pointed out that a person whose name is included in New York's Central Register receive a hearing at which the allegation of abuse or neglect must be proved by a fair preponderance of the evidence only if an employer refuses to hire or terminate the person. The plaintiff in *Valmonte* had asserted she had been unable to obtain work in the child care field because her name was listed in New York's Central Register.

The New York procedure reviewed in *Valmonte* was similar to that employed by DYFS. However, when any New York employer in the child care industry hired an individual whose name was on the Central Register of Child Abuse and Maltreatment, that employer was required to check the Central Register, and give written reasons why the abuser was found hirable. The court noted:

> The Central Register does not simply defame Valmonte, it places a tangible burden on her employment prospects.... This is not just the intangible deleterious effect

---

[14] The "some credible evidence" standard used to substantiate child abuse allegations was also held to be inadequate.

that flows from a bad reputation. Rather, it is a specific deprivation of her opportunity to seek employment caused by a statutory impediment established by the state. Valmonte is not going to be refused employment because of her reputation; she will be refused employment simply because her inclusion on the list results in an added burden on employers who will therefore be reluctant to hire her.

[*Id.* at 1001.]

*Valmonte* observed that "dissemination to potential employers, however, is the precise conduct that gives rise to stigmatization." *Id.* at 1000. The plaintiff in *Valmonte* alleged more than a loss of employment from a simple defamation because the defamation occurs precisely in conjunction with an individual's attempt to attain employment within the child care field, attended with a statutory impediment mandating that employers justify hiring the individual. Hence, the court held that a liberty interest was implicated. *Id.* at 1002. The fact that *any* child care employer *must* consult the list before hiring an applicant, and if they choose to hire must give written reasons to the State, constituted a specific deprivation of her opportunity to seek employment significant enough to satisfy the "plus" requirement of the "stigma plus" test. *Id.* at 1002.

Although *Valmonte* recognized a significant interest on the part of New York in maintaining the existence of its Central Register, it held the procedural protections inadequate, violative of procedural due process, and a source of significant error. *Id.* at 1003. The State of New York's highest court came to a similar conclusion a little more than a year later. *Lee TT v. Dowling*, 87 *N.Y.*2d 699, 642 *N.Y.S.*2d 181, 664 *N.E.*2d 1243 (N.Y.1996).

We turn now to New Jersey's regulatory scheme. As noted, under *N.J.S.A.* 9:6–8.10a(b)(13), DYFS may release the Central Registry information to child service entities required by statute to consider child abuse. *N.J.S.A.* 9:6–8.10a(b)(14) requires release of Central Registry information, in whole or in part, in certain proceedings before child service organizations upon a determination by the person conducting the proceeding that the disclosure is necessary. In New Jersey, entry on the Central Registry can impact adoption, foster parentage, and the ability to be a licensed

day care provider. The impact under the present regulatory scheme [15] appears to fall short of what was considered in *Valmonte*, where all child care facilities were required to check the Central Registry. *See New York Soc. Serv.* § 424a. The New Jersey statutory scheme does implicate appellant's right to be a child care provider, although not to the same extent as the law in New York reviewed in *Valmonte*. The impact on appellant's liberty interest vis-a-vis employment is not here strong enough to satisfy the "plus" element of the "stigma plus" test.[16]

■ While appellant has shown some impact on her reputation, a constitutional violation requires proof of implication of some additional liberty interest. *Doe v. Poritz, supra* (142 *N.J.* at 102, 662 *A.2d* 367) (information of criminal conviction is also contained in public records). Because we need not conclude that the procedure utilized by DYFS impacts on constitutional due process where there are alternative grounds available for relief, *Donadio v. Cunningham*, 58 *N.J.* 309, 325–326, 277 *A.2d* 375 (1971), we conclude that the procedures used by DYFS here violate fundamental fairness, and therefore, violate administrative due process requirements. Hence, an appropriate trial-type hearing is required on that basis.

## II.

■ As an additional ground, appellant also asserts entitlement under the APA to a "trial-type" hearing. Such a hearing is

---

[15] We note that proposed New Jersey regulations would require Child Care Centers, defined as facilities caring for six or more children under thirteen years of age for less than twenty-four hours a day, *N.J.A.C.* 10:15–1.2, to check the background of their employees for substantiated abuse. 30 *N.J.A.R.* 1264(a), proposed Rule *N.J.A.C.* 10:122–4.9.

[16] We note in passing that the 1997 amendment to the statute allows disclosure of the disposition of the investigation to "a person who has filed a report of suspected child abuse or neglect." We do not address whether the law as amended in 1997, which significantly broadens disclosure, is violative of procedural due process.

required where there are disputed adjudicative facts, when the party is entitled to *de novo* administrative or judicial review, when some urgency requires temporary action pending hearing, or when the advantages of a trial-type hearing clearly outweigh the disadvantages. Kenneth Culp Davis, *Administrative Law Treatise,* Second Edition (1979), Vol. 2, Ch. 12, p. 406. The APA requires a "trial-type" hearing in a "contested case," *N.J.S.A.* 52:14B–10(c), defined as:

> a proceeding, including any licensing proceeding, in which the legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties are required *by constitutional right or by statute* to be determined by an agency by decisions, determinations, or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing, but shall not include any proceeding in the Division of Taxation, Department of the Treasury, which is reviewable de novo by the Tax Court.
>
> [*N.J.S.A.* 52:14B–2(c) (emphasis added).]

■ There is technically no "contested case" here under the statute because appellant's rights, benefits, or other legal relations are not required to be determined by the agency by either the constitution or by statute. However, we hold that the case at bar is tantamount to a "contested case," and that a trial-type hearing is required in a situation where determinative facts are in dispute.

■ At the federal constitutional level, the Supreme Court has held that at a bare minimum, administrative due process requires notice and an opportunity to be heard; a trial-type hearing is not always required. *Mathews v. Eldridge,* 424 *U.S.* 319, 332–335, 96 *S.Ct.* 893, 901–903, 47 *L.Ed.*2d 18, 32 (1976); *Fuentes v. Shevin,* 407 *U.S.* 67, 79, 92 *S.Ct.* 1983, 1993, 32 *L.Ed.*2d 556, 569 (1972) *reh'g. den.,* 409 *U.S.* 902, 93 *S.Ct.* 177, 34 *L.Ed.*2d 165 (1972) (quasi-judicial type proceeding); *Stanley v. Illinois,* 405 *U.S.* 645, 650, 92 *S.Ct.* 1208, 1212, 31 *L.Ed.*2d 551, 558 (1972) (quasi-judicial type proceeding). Determining entitlement to a hearing for a person adversely affected by government action, and the nature of the hearing, requires a weighing of factors. *Zinermon v. Burch, supra* 494 *U.S.* 113, 127, 110 *S.Ct.* 975, 984, 108 *L.Ed.*2d 100, 115 (1990); *Doe v. Poritz, supra* (142 *N.J.* at 106–107, 662 *A.*2d 367).

*Mathews v. Eldridge, supra* (424 *U.S.* at 335, 96 *S.Ct.* at 903, 47 *L.Ed.*2d at 33), listed the factors to be considered:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Even if it does not rise to the level of a constitutional violation, we conclude that the present procedure set forth in the statute and DYFS regulations is violative of administrative due process and fundamental fairness. Where an administrative review officer makes credibility findings, those functions are quasi-judicial.[17] *See Cunningham v. Dept. of Civil Service,* 69 *N.J.* 13, 21, 350 *A.*2d 58 (1975). "The right to a hearing before a governmental agency, whose proposed action will affect the rights, duties, powers or privileges of, and is directed at, a specific person, has long been imbedded in our jurisprudence." *Cunningham v. New Jersey Dept. of Civil Serv., supra* (69 *N.J.* at 19, 350 *A.*2d 58). Therefore, procedural fairness often requires a hearing where an executive agency takes action against a person. *See Limongelli v. New Jersey State Bd. of Dentistry,* 137 *N.J.* 317, 328, 645 *A.*2d 677 (1993). Fairness here requires a hearing with the opportunity for appellant to challenge the evidence relied upon by DYFS and present evidence and argument in response. An agency determination cannot rest on evidence which the accused has neither seen nor had any opportunity to test for trustworthiness. *Brotherhood of R.R. Trainmen v. Palmer,* 47 *N.J.* 482, 487, 221 *A.*2d 721 (1966). Thus, a hearing may be required even where not mandated by statute, the Constitution, or the APA. *Limongelli, supra,* 137 *N.J.* at 328, 645 *A.*2d 677.

Although there is no showing in this case as there was in *Valmonte v. Bane, supra* (18 *F.*3d at 1002–1004) of a high percent-

---

[17] We note that this procedure cannot be characterized as investigatory, as findings and conclusions were made and there was an adjudication of substantiated abuse with a specified appeal process.

age of erroneous inclusion of individuals in DYFS's Central Registry,[18] the type of proceeding employed here, where credibility determinations cannot be reviewed due to the lack of a record, may well generate a high potential of error. The State certainly has a strong interest in determining whether or not child abuse determinations are substantiated, and in ensuring that accurate information, while not public, is made available on circumscribed terms to the limited entities specified in the statute. *See N.J.S.A.* 9:6–8.10a. This interest extends to maintaining the Central Registry, provided persons who are listed therein have an appropriate and meaningful avenue to challenge inclusion in that registry at the administrative agency level.

In *J.E. on behalf of G.E. v. State,* 131 *N.J.* 552, 568, 622 *A.2d* 227 (1993), Justice Stein noted that "we cannot ignore the overriding concern for the appearance of procedural fairness in agency adjudications." *Citing Marshall v. Jerrico, Inc.,* 446 *U.S.* 238, 242–244, 100 *S.Ct.* 1610, 1613–1614, 64 *L.Ed.2d* 182, 188–189 (1980). As the Court noted, the very purpose for which the Office of Administrative Law (OAL) was established was to foster a perception of objectivity and impartiality in agency adjudications. *Unemployed–Employed Council of N.J., Inc. v. Horn,* 85 *N.J.* 646, 650, 428 *A.2d* 1305 (1981).

The administrative-appeals procedure used by DYFS does not adequately address or protect the appellant from an improper or erroneous listing in the Central Registry. Hence, DYFS must augment its procedures to provide additional process to address the deficiencies. As in *J.E. on behalf of G.E. v. State, supra* (131 *N.J.* at 568, 622 *A.2d* 227), and based on the adjudicatory nature of listings in the Central Registry, we conclude that these cases must

---

[18] After oral argument DYFS furnished us with limited statistics which indicated that in the last six months of 1995, 38 out of 229 appeals overturned substantiated abuse findings. In 1996, out of 724 substantiated abuse cases, 72 were overturned administratively (with 43 apparently still pending). For the first 10 months of 1997, out of 830 such cases, 45 were overturned and 368 appeals are still pending.

be regarded as essentially equivalent to "contested matters" under the APA.[19]  The nature of the protections needed are best served by a trial-type hearing before an ALJ.  The additional protections afforded by such a hearing are warranted because of the significant liberty interest involved.[20]  In addition, as noted, fundamental fairness also requires such a procedure.  *See State v. Michaels,* 136 *N.J.* 299, 309–318, 323, 642 *A.*2d 1372 (1994).  This will have the requisite necessary benefit of creating a meaningful record for appellate review where there is a challenge to a finding of substantiated child abuse.

We recognize the advantages of maintaining the informal conference,[21] with a relaxed, non-adversarial setting.  This can afford the parties an opportunity to explore resolution of the problem and resolve differences.  Continued use of the informal conference is thus encouraged, so long as the presiding official does not subsequently represent the agency and an adequate record of that conference is made.  *See J.E. on behalf of G.E. v. State, supra* (131 *N.J.* at 569, 622 *A.*2d 227).

### III.

Appellant also asserts that DYFS did not follow its own procedures in concluding that the allegations of child abuse against her had been substantiated.

DYFS's selection of a record and document review in appellant's case is contrary to its own regulations and procedures in situations

---

[19] *See State v. Tuddles,* 38 *N.J.* 565, 577, 186 *A.*2d 284 (1962) (procedure for juvenile hearing changed even though status quo did not violate either the constitution or the applicable rule).

[20] Additional protections are especially warranted due to the likelihood of child witnesses, who may or may not be competent and are easily influenced.  *See State v. R.W.,* 104 *N.J.* 14, 20, 514 *A.*2d 1287 (1986).

[21] The Regional Dispositional Conference procedure has since been added to the regulations.  *N.J.A.C.* 10:120A–2, adopted on December 30, 1997 (*see* 30 *N.J.Reg.* 9).

where a factual dispute exists. Although this alone might be sufficient reversible error, *see Frisby v. U.S. Dep't of Housing & Urban Devel.*, 755 *F*.2d 1052, 1055–1056 (3d Cir.1985), in light of our determination that a trial-type hearing is required we do not address the issue further.

### IV.

Appellant next asserts that DYFS's action in finding that abuse was substantiated was "arbitrary, capricious and unsupported by substantial credible evidence." In light of our decision remanding for a hearing and findings in a trial type proceeding, with at least a preponderance of the evidence standard, we do not address the sufficiency of the record argument any further.

### V.

Finally, appellant asserts that certain documents were not made available to her at the conference level, including DYFS's report of findings. She contends that the failure to make those documents available to her was a violation of *N.J.S.A.* 9:6–8.10a and her due process rights.

As noted above, *N.J.S.A.* 9:6–8.10a governs reports and information of child abuse reports. The statute requires that all such records be kept confidential, with the exceptions outlined in the statute. That statute was amended, effective June 6, 1996, to also allow for disclosure of such reports to:

(12) Any person appealing a division service or status action or a substantiated finding of child abuse or neglect and his attorney or authorized lay representative upon a determination by the division or the presiding Administrative Law Judge that such disclosure is necessary for a determination of the issue on appeal;

[*N.J.S.A.* 9:6–8.10a(b)(12).]

Here, the incident occurred in January 1996, and appellant thereafter challenged the substantiated abuse determination. Before the June 16 amendment to the statute it was uncertain whether appellant would have been allowed access to the documents under the existing statutes and regulations (aside from fundamental

fairness and due process considerations) as she would not have qualified under the exceptions to the confidentiality of those records in *N.J.S.A.* 9:6–8.10a. *See Matter of Tenure Hearing of Tyler*, 236 *N.J.Super.* 478, 486–487, 566 *A.2d* 229 (App.Div.1989), *certif. denied* 121 *N.J.* 615, 583 *A.2d* 315 (1990).[22]

Retroactive application of changes in the law are not generally favored. *Gibbons v. Gibbons*, 86 *N.J.* 515, 521, 432 *A.2d* 80 (1981); *Serrano v. Gibson*, 304 *N.J.Super.* 314, 318–320, 700 *A.2d* 390 (App.Div.1997). However, absent manifest injustice, retroactive application is warranted where: the legislative intent expressly or impliedly states that the change is retroactive; the amendment is ameliorative or curative in nature, and was added in order to better carry out the intent of the original statute; or it is necessary to fulfill the parties' reasonable expectations. *Serrano, supra* (304 *N.J.Super.* at 318–320, 700 *A.2d* 390).

The legislative history of this amendment is sparse. A release from the Governor merely stated:

> This bill will enable agencies and individuals to work collaboratively to protect the children of our state from abuse and neglect.
>
> ["Office of the Governor: News Release," June 7, 1996, commenting on *L.* 1996, *c.* 32, § 1.]

In addition to fundamental fairness principles, we would nonetheless apply the statute here because the Regional Conference did not take place until after the effective date of the amendment while appellant's administrative appeal was in process. Because facts and arguments were not made available to appellant at the time of the record and document review, the procedure was rendered fundamentally unfair. *High Horizons v. Dept. of Transportation*, 120 *N.J.* 40, 575 *A.2d* 1360 (1990). We hold that documents upon which DYFS intends to rely must be disclosed to

---

[22] The appellant does not argue that the items would have been available to her before the change in the law adding *N.J.S.A.* 9:6–8.10a(b)(12), upon which she relies. DYFS notes that the initial oral request occurred in May of 1996, at which time it was prohibited from releasing the information requested.

appellant's attorney. Informants' names may be redacted if necessary.[23]

While *N.J.S.A.* 9:6–10a(b)(12) leaves some discretion in the ALJ or hearing officer to determine whether it is necessary to the administrative appeal to disclose such information to the alleged abuser, this case warrants disclosure of the record to appellant, except for two 1991 items which we consider remote. With that exception, the record does not consist of any documents which could not or should not have been disclosed to appellant or her attorney. Nor is the policy of nondisclosure, to protect the names of those who refer abuse cases to DYFS, implicated in this case because the referents here were a police officer and H.G. *See N.J.S.A.* 9:6–8.13. Appellant may not have known the identity of the police officer, but she was aware of most of what her son said to school officials and the caseworker. Therefore, on remand the documents may be utilized by appellant to contest the allegations against her.

Appellant also asserts that certain documents should not be considered by this court on appeal, because they were not in the record below. It is true that submission of documents outside the record had been called a "gross violation of appellate practices and rules." *Tremonte v. Jersey Plastic Molders, Inc.*, 190 *N.J.Super.* 597, 601 n. 1, 464 *A.*2d 1193 (App.Div.1983). In view of our remand and order requiring disclosure of documents, we do not address the matter further.

Reversed and remanded for further proceedings in accordance with this opinion.

SKILLMAN, J.A.D., concurring.

---

[23] We recently entered an order directing that certain of the records withheld by DYFS be immediately made available to appellant's attorney for limited review in connection with this appeal.

Although I concur with the result reached by the majority, I disagree with the doctrinal foundation upon which its opinion rests. Therefore, I find it necessary to write separately.

The majority opinion contains a lengthy discussion of the right to a trial-type hearing under the procedural due process guarantees of the United States and New Jersey Constitutions. *U.S. Const.* amend. XIV, § 1; *N.J. Const.*, art. I, par. 1 (maj. op. at 402–404, 407–409, 715 *A.*2d at 314–315, 316–317). However, the majority ultimately disavows reliance upon "constitutional due process" and instead concludes that DYFS' procedures for determining whether child abuse allegations have been substantiated "violate fundamental fairness." (maj. op. at 409, 715 *A.*2d at 318). I am unable to reconcile this mode of analysis with the prior New Jersey cases dealing with the right to a trial-type hearing.

Our Supreme Court has repeatedly stated that the due process tests set forth in *Mathews v. Eldridge,* 424 *U.S.* 319, 96 *S.Ct.* 893, 47 *L.Ed.*2d 18 (1976) should be employed in determining what type of procedures are required to assure fairness in the administrative process. *See, e.g., J.E. on Behalf of G.E. v. State, Dept. of Human Servs.,* 131 *N.J.* 552, 565–567, 622 *A.*2d 227 (1993); *High Horizons Dev. Co. v. State, Dept. of Transp.,* 120 *N.J.* 40, 51–53, 575 *A.*2d 1360 (1990); *Board of Educ. of Plainfield v. Cooperman,* 105 *N.J.* 587, 599, 523 *A.*2d 655 (1987); *see also Doe v. Poritz,* 142 *N.J.* 1, 106–07, 662 *A.*2d 367 (1995); *In re Allegations of Physical Abuse at Blackacre Academy,* 304 *N.J.Super.* 168, 182–183, 698 *A.*2d 1275 (App.Div.1997).

> The *Mathews* three-pronged test requires that we consider (1) the private interest at stake; (2) the risk of erroneous deprivation of that interest through the agency procedures used, and the probable value of additional or substitute procedural safeguards; and (3) the State's interest, including the fiscal and administrative burdens that the additional procedural safeguards would entail.
>
> [*J.E. on Behalf of G.E., supra,* 131 *N.J.* at 566–567, 622 *A.*2d 227.]

These tests are applied to determine whether a trial-type hearing is required and, if not, what alternative procedural safeguards must be provided to satisfy due process requirements. *Ibid.; High Horizons Dev. Co., supra,* 120 *N.J.* at 51–53, 575 *A.*2d 1360;

*Blackacre Academy, supra,* 304 *N.J.Super.* at 182–183, 698 *A.*2d 1275.

However, the "fundamental fairness" doctrine relied upon by the majority has not been employed by New Jersey courts in determining whether a party is entitled to a trial-type hearing before an administrative agency. Our courts have invoked this doctrine in the field of administrative law only as authority for requiring agencies to adopt procedures which reduce the risk of arbitrary administrative action and facilitate appellate review. *See, e.g., Donaldson v. Board of Educ. of North Wildwood,* 65 *N.J.* 236, 320 *A.*2d 857 (1974) (local board of education required to provide statement of reasons for not renewing employment contract of untenured teacher as safeguard against arbitrary or abusive exercise of its discretionary powers); *Monks v. New Jersey State Parole Bd.,* 58 *N.J.* 238, 277 *A.*2d 193 (1971) (Parole Board required to provide statement of reasons for denial of parole to assure procedural fairness and prevent arbitrary exercise of administrative power). *Limongelli v. New Jersey State Bd. of Dentistry,* 137 *N.J.* 317, 645 *A.*2d 677 (1993), which the majority cites for the proposition that "a hearing may be required even where not mandated by statute, the Constitution, or the APA" (maj. op. at 411, 715 *A.*2d at 319), does not explicitly rest upon the "fundamental fairness" doctrine but rather upon what the Court characterized as "principles of administrative law." 137 *N.J.* at 328–329, 645 *A.*2d 677. Moreover, although the Court in *Limongelli* did not cite *Mathews v. Eldridge,* it relied upon factors similar to the *Mathews* tests, including the "profound consequences" of an "effective loss of a professional license" and the need for cross-examination of a witness who "may have shaded his testimony" out of self-interest, *id.* at 329, 645 A.2d 677, in determining that the appellant was entitled to some form of hearing. Most significantly, the Court considered this alternative ground of decision only after it had first concluded that appellant did not have a constitutional right to a hearing. *Id.* at 326–28, 645 A.2d 677. Consequently, even assuming the "principles of administrative law" upon which *Limongelli* rests are· derived from the same

source as the "fundamental fairness" doctrine articulated in *Monks* and *Donaldson, Limongelli* is consistent with the admonition of *Doe v. Poritz, supra,* that "[f]undamental fairness is a doctrine to be sparingly applied," 142 *N.J.* at 108, 662 *A.2d* 367 (quoting *State v. Yoskowitz,* 116 *N.J.* 679, 712, 563 *A.2d* 1 (1989) (Garibaldi, J., concurring and dissenting)), and that the doctrine should be relied upon only if "there [is] no explicit statutory or constitutional protection to be invoked." *Id.* at 109, 662 *A.2d* 367.

In support of its conclusion that this appeal should be decided on the basis of the fundamental fairness doctrine, the majority relies upon the principle that "a court should not reach and determine a constitutional issue unless absolutely imperative in the disposition of the litigation." *Donadio v. Cunningham,* 58 *N.J.* 309, 325–326, 277 *A.2d* 375 (1971). However, the policy considerations upon which this principle of judicial restraint rests—which include "respect for other branches and levels of government," and "an awareness of the limitations of judicial power," *O'Keefe v. Passaic Valley Water Com'n,* 132 *N.J.* 234, 241–242, 624 *A.2d* 578 (1993)—apply with equal, if not greater force, to a decision grounded upon the fundamental fairness doctrine.[1] A decision declaring that principles of fundamental fairness are violated by DYFS' procedures for determining whether child abuse allegations have been substantiated would have the same impact upon the administration of the agency as a decision grounded upon constitutional due process guarantees. Moreover, a decision declaring DYFS' procedures invalid that is firmly moored to express constitutional guarantees and case law inter-

---

[1] Incidentally, it is not clear to me that the fundamental fairness doctrine actually rests on non-constitutional grounds. The seminal case which established this doctrine in the field of administrative law, *Monks v. New Jersey State Parole Bd., supra,* was grounded upon Article VI, section 5, paragraph 4, of the New Jersey Constitution, which provides for "review, hearing and relief" in actions in lieu of prerogative writs "in the manner provided by rules of the Supreme Court." *See* 58 *N.J.* at 248–249, 277 *A.2d* 193; *see also Fischer v. Township of Bedminster,* 5 *N.J.* 534, 540, 76 *A.2d* 673 (1950) (noting that the Superior Court's authority under this constitutional provision includes "superintendence of inferior tribunals").

preting those guarantees is less subject to charges of judicial subjectivism than one based entirely on general principles of fairness that are not grounded upon any express constitutional provision,[2] which may be the reason the Court has indicated the doctrine should be "sparingly applied." *Doe v. Poritz, supra,* 142 *N.J.* at 108, 662 *A.*2d 367. Therefore, I conclude that the due process tests set forth in *Mathews* should be employed in determining whether appellant is entitled to a trial-type hearing.

First, I consider the "private interest" affected by DYFS' determination that the allegations of child abuse against appellant were "substantiated." *Mathews, supra,* 424 *U.S.* at 335, 96 *S.Ct.* at 903, 47 *L.Ed.*2d at 33. . Pursuant to *N.J.S.A.* 9:6–8.11, such a determination is recorded and maintained in a Central Registry. Although the reports contained in the Central Registry are confidential, *N.J.S.A.* 9:6–8.10a(a), they are subject to release to various interested parties. *N.J.S.A.* 9:6–8.10a(b). The parties who may obtain access to reports in the Central Registry now include any child care agency which conducts a background check or employment-related screening of an employee or person seeking employment, *N.J.S.A.* 9:6–8.10a(b)(13); *N.J.S.A.* 30:5B–6.4, or any person being evaluated as a prospective or adoptive parent, *N.J.S.A.* 9:6–8.10a(b)(16); *N.J .S.A.* 9:3–54.2(b)(2).[3] Moreover, as

---

[2] In addition, if it is determined that a trial-type hearing is required by "statute" or "constitutional right," a party is generally entitled to a hearing before an Administrative Law Judge (ALJ), *N.J.S.A.* 52:14B–2(b); *N.J.S.A.* 52:14B–10(c), which promotes the legislative policy "to bring impartiality and objectivity to agency hearings and ultimately to achieve higher levels of fairness in administrative adjudications." *Unemployed–Employed Council of New Jersey v. Horn,* 85 *N.J.* 646, 650, 428 *A.*2d 1305 (1981). I agree with the majority's view that appellant should be afforded the opportunity for a hearing before an ALJ. However, if the right to a hearing is not based on any statutory or constitutional provision, I question whether we have the authority to order a hearing before an ALJ based solely on our view that a controversy is "essentially equivalent" to "contested matters" under the APA (maj. op. at 413, 715 *A.*2d at 319).

[3] As described in greater detail at pp. 399–402, 715 *A.*2d 312–314 of the majority's opinion, reports of substantiated child abuse are also subject to disclosure to various other parties.

a result of the enactment of chapter 254 of the Laws of 1997, which became effective on March 16, 1998, all day care centers are required to check with DYFS to determine whether any of their new employees have been the subject of abuse findings, *N.J.S.A.* 9:5B–6.1; *N.J.S.A.* 30:5B–6.4, and to discharge employees who are thus identified, *N.J.S.A.* 30:5B–6.4(c). Consequently, if appellant were to seek employment with a day care provider or to become a foster or adoptive parent, the determination that the child abuse allegation against her had been substantiated would be brought to the attention of a prospective employer or the agency responsible for the foster care or adoptive placement, thereby diminishing and perhaps totally destroying appellant's opportunity to gain employment in the child care field or to become a foster or adoptive parent.

DYFS argues that appellant has not been deprived of any "cognizable constitutional right" as a result of the inclusion of the report of substantiated child abuse in the Central Registry because "there is no indication in [the] record that [she] is presently pursuing adoption or approval as a foster parent, ... or that she is employed at a day care center." However, it is firmly established in this State that "the impairment of future employability by operation of state law is a protectable liberty interest." *Nicoletta v. North Jersey Dist. Water Supply Comm'n*, 77 *N.J.* 145, 161, 390 *A.*2d 90 (1978). Moreover, even though a person may not have protected liberty interest in becoming a foster or adoptive parent, the right to become a foster parent or seek the adoption of a child also implicates weighty personal interests. *See Smith v. Organization of Foster Families*, 431 *U.S.* 816, 838–847, 97 *S.Ct.* 2094, 2106–2111, 53 *L.Ed.*2d 14, 31–37 (1977); *Spielman v. Hildebrand*, 873 *F.*2d 1377, 1384–1385 (10th Cir.1989); *Thelen v. Catholic Soc. Servs.*, 691 *F.Supp.* 1179 (E.D.Wisc.1988). I also note that even though appellant is not presently employed or seeking employment in the child care field, or seeking to become a foster or adoptive parent, DYFS does not suggest that the finding of substantiated child abuse recorded in the Central Registry could be contested at some future date if appellant later decided to seek

employment in the child care field or to become a foster or adoptive parent.[4]   Therefore, a trial-type hearing at this time seems to represent the only feasible means of affording appellant an opportunity to contest this finding.   The absence of any other opportunity for appellant to contest DYFS' finding of substantiated child abuse distinguishes this case from *Blackacre Academy, supra,* in which we concluded that the appellants' due process rights were not violated by a DYFS finding of substantiated child abuse based solely on a review of documents, because the Department of Education could not revoke their licenses to operate a day school without first affording them an opportunity for a contested case hearing.   304 *N.J.Super.* at 187, 698 *A.*2d 1275.

I turn next to the second *Mathews* test—"the risk of an erroneous deprivation of [appellant's interests] through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards."   *Mathews, supra,* 424 *U.S.* at 335, 96 *S.Ct.* at 903, 47 *L.Ed.*2d at 33.   DYFS charged that appellant had physically abused her twelve year old son by kicking him.   This charge was based on a report by a DYFS caseworker who had interviewed appellant, the son she allegedly kicked and another son.   Appellant allegedly corroborated the abuse allegations in her interview with the caseworker.   Although appellant denied that she had committed any act of child abuse or that she had admitted such acts to the DYFS caseworker, a member of the DYFS staff with the title of "Administrative Review Officer" determined based solely on "a record and document review" and an interview of appellant, without affording appellant any opportunity to cross-examine her accusers, that appellant had committed acts of child abuse and that her denials were incredible.   This determination was subsequently "approved" by another DYFS staff person with the title of "Regional Administrator."   Consequently, unlike in *High Horizons,* where the Court concluded that

---

[4] Because the allegations of abuse in this case were substantiated after June 29, 1995, appellant would not be eligible for a hearing pursuant to *N.J.S.A.* 30:5B–6.6.

appellant did not have a constitutional right to a trial-type hearing because the "credibility and veracity" of witnesses was not "at issue," 120 *N.J.* at 52, 575 *A.*2d 1360 (quoting *Shoreline Assocs. v. Marsh,* 555 *F.Supp.* 169, 175 (D.Md.1983)), this is essentially a credibility case involving "disputed adjudicative facts." *Id.* at 53, 575 *A.*2d 1360. In fact, the denial of the opportunity for cross-examination in a case such as this, which involves conflicting allegations regarding appellant's conduct and statements, presents a greater risk of erroneous decision-making than in *J.E. on Behalf of G.E.,* in which the Court held that the appellant was entitled to a trial-type hearing even though the case turned entirely on the opinions of expert witnesses regarding "the types of services best suited to [a developmentally—disabled person's] unique needs" and "which placement would best achieve the person's habilitative goals." 131 *N.J.* at 566, 622 *A.*2d 227; *see Valmonte v. Bane,* 18 *F.*3d 992, 1004 (2d Cir.1994) (noting that the determination of allegations of child abuse or neglect "are inherently inflammatory, and 'unusually open to the subjective values of' the factfinder") (quoting *Santosky v. Kramer,* 455 *U.S.* 745, 762, 102 *S.Ct.* 1388, 1399, 71 *L.Ed.*2d 599, 612 (1982)).

Moreover, because a Regional Disposition Conference is not transcribed and the Administrative Review Officer's report does not contain the kind of findings of fact and conclusions of law which would be set forth in an ALJ's decision, it is extremely difficult for this court to provide meaningful review of such a determination. *See Blackacre Academy, supra,* 304 *N.J.Super.* at 188, 698 *A.*2d 1275. Therefore, the risks of erroneous decision-making inherent in a final administrative decision based upon the informal procedures of a Dispositional Conference are compounded by the impairment of the opportunity for appellate review to correct arbitrary administrative action.

Turning to the third *Mathews* factor—"the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail," *Mathews, supra,* 424 *U.S.* at 335, 96 *S.Ct.* at

903, 47 *L.Ed.*2d at 33,—the appellant properly concedes "the state has a strong interest in protecting children from the infliction of harm by those charged with their care." However, I perceive no realistic danger that a requirement that persons accused of child abuse be afforded a meaningful opportunity to contest those allegations will prevent DYFS from performing its statutory responsibilities in this area. Although DYFS indicates that it now conducts more than 500 Regional Dispositional Conferences annually and suggests that it would place an undue burden upon the agency to conduct trial-type hearings in such cases, there is no reason to believe that the number of hearings before the ALJs challenging findings of substantiated child abuse would even approach the number of Regional Dispositional Conferences. As in *J.E. on Behalf of G.E.,* I would "endorse the continued use of the informal conference as a means of facilitating and encouraging the early resolution of disputes," 131 *N.J.* at 569, 622 *A.*2d 227, and I am confident that a significant percentage of the contested findings of substantiated child abuse could be resolved at such proceedings. I also note that a trial-type hearing would be required only in cases in which there was a genuine factual issue regarding the occurrence of an act of child abuse or the circumstances of the alleged abuse. See *Contini v. Board of Educ. of Newark,* 286 *N.J.Super.* 106, 120–121, 668 *A.*2d 434 (App.Div.1995), *certif. denied,* 145 *N.J.* 372, 678 *A.*2d 713 (1996). In any event, I believe that the potential adverse consequences of inclusion of a person's name in the Central Registry and the risks of erroneous decisions inherent in DYFS' current procedures are so serious that the opportunity for a trial-type hearing must be afforded even if it could be anticipated that the number of such hearings would be substantial.

Finally, I note that the conclusion that protected liberty interests are implicated by the placement in the Central Registry of a report that a charge of child abuse has been substantiated, and that the procedures which DYFS employed in this case do not adequately protect those interests, is supported by *Valmonte v. Bane, supra,* 18 *F.*3d 992; *Lee TT. v. Dowling,* 87 *N.Y.*2d 699, 642

*N.Y.S.*2d 181, 664 *N.E.*2d 1243 (1996); and *Cavarretta v. Depart-ment of Children & Family Servs.*, 277 *Ill.App.*3d 16, 214 *Ill.Dec.* 59, 660 *N.E.*2d 250 (1996).

EICHEN, J.A.D., concurring.

I concur with my colleagues that appellant was entitled to a trial-type hearing before her name was included on the Central Registry as a "child abuser" and that the D.Y.F.S. determination must be reversed. I write separately because I disagree with both of my colleagues as to the appropriate basis for requiring such a hearing.

I conclude that appellant has not demonstrated a protectable liberty or property interest under the Due Process Clause of the Fourteenth Amendment of the Federal Constitution. Although her interest in preserving her reputation is implicated by the inclusion of her name as a child abuser on the Central Registry, she has not demonstrated "any other tangible loss" to satisfy the "stigma plus" prong recognized in *Valmonte v. Bane*, 18 *F.*3d 992, 999 (2d Cir.1994); *see Doe v. Poritz*, 142 *N.J.* 1, 102, 662 *A.*2d 367 (1995). For example, she has not expressed either a present or future interest in adopting a child, acting as a foster parent, or obtaining employment in the child-care field.[1]

Nonetheless, I conclude that under our State Constitution ap-pellant has demonstrated a sufficient protectable interest in her reputation to justify a trial-type hearing. In *Doe v. Poritz, supra,* 142 *N.J.* at 104–05, 662 *A.*2d 367, our Supreme Court, in conclud-ing that the New Jersey Constitution protects "the right of a

---

[1] My colleagues strain to identify what, if any, "other tangible loss" beyond appellant's reputation might be implicated in this appeal. I disagree that the potential loss of future employment is sufficient to satisfy the "stigma-plus" test of *Valmonte*. However, if federal constitutional law requires an additional interest to be coupled with appellant's interest in her reputation, then perhaps "familial integrity and stability" could qualify as the other required interest; indeed, at least one federal circuit has so observed. *See Bohn v. County of Dakota*, 772 *F.*2d 1433, 1436 n. 4 (8th Cir.1985).

person to be secure in his reputation," iterated the principle that, "where a person's good name or reputation are at stake because of what the government is doing to that person, ... sufficient constitutional interests are at stake." *Ibid.* It stated that:

> Under the State Constitution, we find protectible interests in both privacy and reputation. Our analysis differs from that under the Federal Constitution only to the extent that *we find a protectible interest in reputation without requiring any other tangible loss.* In interpreting the State Constitution, we "look to both the federal courts and other state courts for assistance ... [but][t]he ultimate responsibility for interpreting the New Jersey Constitution ... is ours." *Greenberg [v. Kimmelman,* 99 *N.J.* 552, 568, 494 *A.*2d 294 (1985) ]. In fulfilling that responsibility, "we have generally been more willing to find State-created interests that invoke the protection of procedural due process than have our federal counter-parts." *New Jersey Parole Bd. v. Byrne,* 93 *N.J.* 192, 208, 460 *A.*2d 103 (1983).
>
> [*Id.* at 104, 662 *A.*2d 367 (emphasis added).]

Because I conclude that as a matter of state constitutional law, appellant's "reputation" interest entitles her to a trial-type hearing before her name is included on the Central Registry, I find it unnecessary to apply the doctrine of fundamental fairness as a basis for requiring a hearing, especially in light of the *Doe* Court's admonition that such doctrine be applied only sparingly. *Id.* at 108, 662 *A.*2d 367.